[Cite as *State v. Burkard*, 2025-Ohio-5787.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

BRICE BURKARD,

    DEFENDANT-APPELLANT.

CASE NO. 14-24-36

OPINION AND
JUDGMENT ENTRY

Appeal from Union County Common Pleas Court
Trial Court No. 23-CR-0216

Judgment Affirmed

Date of Decision: December 29, 2025

APPEARANCES:

    *Joel M. Spitzer* for Appellant

    *Raymond Kelly Hamilton* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Brice Burkard ("Burkard"), appeals the August 7, 2024 judgment of sentence of the Union County Court of Common Pleas.

{¶2} This case arises from a number of sexual encounters between Burkard and O.H., a minor child, in summer and early fall 2022. On September 29, 2023, the Union County Grand Jury indicted Burkard on 12 counts: Counts One through Four of rape in violation of R.C. 2907.02(A)(2), (B), first-degree felonies; Counts Five through Eight of sexual battery in violation of R.C. 2907.03(A)(12), (B), third-degree felonies; and Counts Nine through Twelve of unlawful sexual conduct with a minor in violation with R.C. 2907.04(A), (B)(1), fourth-degree felonies. At his initial appearance, Burkard entered not-guilty pleas.

{¶3} A jury trial was held on June 3-5, 2024. At trial, O.H. testified that in the summer and fall of 2022, when she was 15 years old, she was sexually abused by Burkard. At the time, Burkard was an employee of Bible Baptist Church of Marysville, and O.H. and her family regularly attended services at that church.

{¶4} O.H. recalled that the first time the abuse happened was in July of 2022. According to O.H., during the first day of Bible Baptist Church Vacation Bible School ("VBS"), Burkard picked up O.H. and her brother from their home. Burkard dropped O.H.'s brother off at the YMCA to work out, and O.H. and Burkard went to the store to pick up some supplies for VBS. After finishing shopping, they returned to the church and sat in Burkard's vehicle in the church parking lot. As

they listened to music in the car, Burkard began touching her and put his hand on O.H.'s thigh, which she pushed away. O.H. entered the church building to calm down and when she returned to the car, Burkard put his fingers in her vagina, causing her to cry. O.H. remembered that Burkard instructed her not to tell his wife about what had happened.

{¶5} Then, O.H. described another time that the abuse happened. According to O.H., approximately one week after the first incident, she was at the church socializing with her brother and his friends. Burkard pulled her aside and they walked to his car parked in the church parking lot, and he told her he was upset that she was talking to the other boys. O.H. recalled that Burkard put his fingers inside her vagina.

{¶6} O.H. described another such incident that happened on a Wednesday evening after a church service. When O.H. came out of the restroom, Burkard was waiting for her and instructed her to go to the car. Once they were in Burkard's car in the parking lot, he again put his fingers in her vagina. O.H. recalled that incident specifically because they were almost caught by other church members.

{¶7} O.H. described the last time that the abuse happened which was a Sunday evening in September 2022. She stated that Burkard drove her home from church and, on the way, he started touching her thigh and then worked his way up toward her vagina. O.H. said that she would push away his hand and make her body stiff to thwart him, but those efforts were unsuccessful. O.H. stated that, during the

drive to her home, Burkard put her fingers in her vagina while he drove. O.H. recalled that she started crying a lot and Burkard tried to reassure her that what they were doing was fine. O.H. stated that when she got to her house, she went to her friend's house where she changed into different clothing and purposely left the dress at the friend's house because of the association that it now had with Burkard's actions.

{¶8} According to O.H., although she only specifically described four incidents, it actually happened approximately 15 to 20 times. O.H. stated that it happened in a "routine" where they would drop her brother off at the gym and return to the church parking lot where he would put his fingers in her vagina. In addition to putting his fingers in her vagina, Burkard also touched her breasts on several occasions.

{¶9} At trial, the State also played the body-worn camera footage of Officer Alex Posterli's interview with O.H. on June 29, 2023 and the video recording of O.H.'s forensic interview at the Child Assessment Center ("CAC") in July 2023. In those recordings, O.H. described the incidents in a manner largely consistent with her trial testimony.

{¶10} The jury returned not guilty verdicts with respect to Counts Two and Three, but found Burkard guilty of the remaining counts. The trial court continued the matter for sentencing and ordered a PSI.

{¶11} On July 24, 2024, Burkard appeared for sentencing. The trial court determined that for the purpose of sentencing, Counts One, Five, and Nine merged; Counts Four, Eight, and Twelve merged; Counts Six and Ten merged; and Counts Seven and Eleven merged. The State elected to have Burkard sentenced on Counts One (Rape), Four (Rape), Six (Sexual Battery), and Seven (Sexual Battery), respectively. The trial court then sentenced Burkard to an indefinite term of 5 to 7.5 years in prison on Count One, 5 years in prison on Count Four, 24 months in prison on Count 6, and 24 months in prison on Count 7. The trial court ordered the sentences to run consecutively to each other for an aggregate term of 14 to 16.5 years in prison.[1] Burkard was further ordered to register as a sex offender for life.

{¶12} On August 21, 2024, Burkard filed his notice of appeal. He raises five assignments of error which we elect to consider in an order that facilitates our resolution of the case.

### First Assignment of Error

**The trial court abused its discretion when it entered a judgment against the Appellant when the judgment was not supported by the manifest weight of the evidence.**

### Second Assignment of Error

**The trial court erred when it failed to grant the Defendant's motion for acquittal as the guilty verdict at the trial court was not supported by sufficient evidence.**

---

[1] The trial court further ordered that the sentences in the instant case be served consecutively to a Champaign County case.

{¶13} In his first two assignments of error, Burkard argues that his convictions were not supported by sufficient evidence and were not supported by the manifest weight of the evidence. For the reasons that follow, we disagree.

*Standards of Review*

{¶14} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997), *superseded by statute on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, we address each legal concept individually.

{¶15} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

**{¶16}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[w]eigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Burkard's Convictions*

**{¶17}** We initially highlight that Burkard was not actually *convicted* of Counts Five and Eight (Sexual Battery) or any of the unlawful sexual conduct with a minor charges (Counts Nine through Twelve) because those charges merged with Counts One, Four, Six, and Seven as allied offenses of similar import for purposes of sentencing. *State v. Whitfield*, 2010-Ohio-2, ¶ 12, 16, 24 (crimes found to be allied offenses merge into a single conviction for sentencing; a "conviction" consists

of a guilty verdict *and* the imposition of a sentence or penalty). Because we affirm his convictions on Counts One, Four, Six, and Seven through our analysis below, we need not address any arguments challenging the sufficiency or weight of the evidence regarding the jury's findings of guilt as to the remaining counts, including all four counts of unlawful sexual conduct with a minor. *State v. Bender*, 2024-Ohio-1750, ¶ 14-15 (3d Dist.); *State v. Risner*, 2022-Ohio-3877, ¶ 11 (3d Dist.) (when allied offenses are merged for purposes of sentencing and there is sufficient evidence to support the offense elected by the State for sentencing, the appellate court need not consider the sufficiency or weight of the evidence on the unelected allied offense because any error would be harmless beyond a reasonable doubt).

{¶18} Burkard was convicted of rape in violation of R.C. 2907.02(A)(2). That statute provides that "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The term "sexual conduct" includes "vaginal intercourse between a male and female" as well as "the insertion, however slight, of any part of the body" into the vaginal opening of another. R.C. 2907.01(A). *See State v. Melendez*, 2009-Ohio-4425, ¶ 14 (9th Dist.) ("insertion, however slight, of a part of the body or other object within the vulva or labia is sufficient to prove vaginal penetration for purposes of proving sexual conduct as defined in R.C. 2907.01(A) and rape in violation of R.C. 2907.02"). "'Force' means any violence, compulsion, or

Case No. 14-24-36

constraint physically exerted by any means upon or against a person or thing." R.C.
2901.01(A)(1).

{¶19} Burkard was also found guilty of sexual battery in violation of R.C.
2907.03(A)(12) which provides that "[n]o person shall engage in sexual activity
with another; cause another, not the spouse of the offender, to engage in sexual
activity with the offender; or cause two or more other persons to engage in sexual
activity when . . . [t]he other person, or one of the other persons, is a minor, the
offender is a cleric, and the other person is a member of, or attends, the church or
congregation served by the cleric."[2] The sexual battery statute provides that "cleric"
has the same meaning as in R.C. 2317.02 which provides that "'[c]leric' means a
member of the clergy, rabbi, priest, Christian Science practitioner, or regularly
ordained, accredited, or licensed minister of an established and legally cognizable
church, denomination, or sect." R.C. 2317.02(C)(2)(a). Courts have found that
division (A)(12) of the sexual battery statute "is a strict liability offense, [and] no
culpability element was required to be alleged in the indictment for the sexual
battery charge." *State v. Curtis*, 2009-Ohio-192, ¶ 32 (12th Dist.). "The relationship
between a pastor and a minor church member or attendee is akin to that of a parent-
child or teacher-student relationship, as it involves elements of control and
supervision." *Id.* at ¶ 26. "In addition, a strict liability interpretation is supported

---

[2] We note that, in the current version of the sexual battery statute, the subsection that relates to sexual activity involving members of clergy is R.C. 2907.03(A)(13).

by the fact that [R.C. 2907.03(A)(12)] requires the finding of a specific factual condition, i.e., that the defendant is a cleric and the alleged minor victim is a member of, or is attending, the defendant's church." *Id.*

*Analysis: Sufficiency of the Evidence*

{¶20} In support his argument that his convictions are not supported by sufficient evidence, Burkard raises two arguments. First, he contends that the State did not present sufficient evidence to satisfy the "force" requirement of his rape convictions. Next, he argues that the State did not present sufficient evidence from which the jury could find that he fits the legal definition of a "cleric." For the reasons that follow, we disagree.

{¶21} With respect to his argument that the State did not present sufficient evidence to satisfy the "force" requirement of his rape convictions, Burkard failed to provide any arguments, citations, or parts of the record to demonstrate how the State failed to present evidence on the element of force. "'[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal.'" *State v. Costell*, 2016-Ohio-3386, ¶ 86 (3d Dist.), quoting *State v. Stelzer*, 2006-Ohio-6912, ¶ 7 (9th Dist.). If an argument exists that can support an assignment of error, it is not this court's duty to root it out. *State v. Shanklin*, 2014-Ohio-5624, ¶ 31 (3d Dist.). Accordingly, we need not address Burkard's argument that the State failed to establish that the "force" element had been met.

{¶22} Next, we turn to Burkard's argument that the State failed to present sufficient evidence to establish that Burkard was a "cleric." Specifically, Burkard argues that he is only a high-school graduate without any formal religious education or training, such as seminary or a Bible college. He also contends that he is not a licensed minister and has never been ordained. Thus, he contends that he does not meet the applicable statutory definition of a "cleric."

{¶23} At trial, Pastor Jeremy Stout ("Pastor Stout"), the pastor of Bible Baptist Church, testified that he has known Burkard since the time he was a child and that he had been a consistent presence at the church since the time he was in fifth or sixth grade. (June 3, 2024 Tr. at 210-211). Pastor Stout testified that Burkard had been a paid, full-time employee of Bible Baptist Church beginning in 2022. (*Id.* at 217). According to Pastor Stout, the position that Burkard filled became available after the general assistant that the church was training left to become a pastor of a church in Illinois. (*Id.* at 219-220). Burkard was chosen to fill the vacancy because he was "faithful and was in church all the time." (*Id.* at 219). He had a willingness to help and assist in church ministries and had grown up in the church. (*Id.*).

{¶24} Burkard's compensation for his employment at the church was approximately $50,000, including benefits. (*Id.* at 217). Some of the benefits of Burkard's employment at the church included the church providing him with a vehicle to perform his duties, including visiting church members at their homes,

evangelization, and checking on sick and elderly church members. (*Id.* at 217-218). The church also provided Burkard with a laptop. (*Id.* at 218-219).

**{¶25}** Pastor Stout confirmed that, at the time Burkard was hired as an assistant, he had not graduated from college, including Bible college, and did not have any formal Biblical or clerical training prior to his employment. (*Id.* at 237). Further, when Burkard was hired at the church, he was not required to complete official training or certification to begin his work. (*Id.*). Pastor Stout testified that the intent in hiring Burkard, as well as other young men that they had hired over the years, was to mentor and train the men to become pastors and full-time ministers. (*Id.* at 237-238).

**{¶26}** According to Pastor Stout, Burkard's duties included providing "Biblical messages to the people." (June 3, 2024 Tr. at 220). Although Burkard worked most often with the junior high and high school aged members of the church, he also occasionally preached to the adult congregation. (*Id.* at 244). Pastor Stout confirmed that Burkard was in a position of authority in the church. (*Id.* at 221). Pastor Stout recalled that Burkard lead different ministries including the summer kids day camp, assisting with Vacation Bible School, serving as a camp counselor, and "door knocking" efforts. (*Id.* at 221-223, 227).

**{¶27}** Pastor Stout was provided the applicable, legal definition of a cleric and was asked some further questions regarding the scope of Burkard's employment in that light. (*Id.* at 241-243). Pastor Stout stated that Bible Baptist Church does

not have priests or rabbis, but they do have clergy. (*Id.* at 242-243). Pastor Stout described himself as a licensed and accredited minister. (*Id.* at 243). Pastor Stout opined that although Burkard is not a licensed minister, he is "accredited" in the sense that Pastor Stout gave him the authority to perform his duties at the church. (*Id.* at 243-244). Pastor Stout further testified that he is accredited and licensed and hired people to help teach and train under his license, including with Burkard. (*Id.* at 245). According to Pastor Stout, members of the clergy stand up in church and preach evangelizing messages which explain the gospel of Jesus Christ to educate and convert others to believe in Jesus. (*Id.* at 244-245). According to Pastor Stout, Burkard "absolutely" had duties that involved talking to others about Jesus Christ and trying to bring others closer to him. (*Id.* at 244). Pastor Stout testified that he gave Burkard instruction on how to deliver evangelizing messages through teaching him Bible doctrine and giving Burkard advice on how to effectively get his messages across. (*Id.* at 245-246). Finally, Pastor Stout opined that Burkard was active as a member of the clergy as defined by the applicable statute. (*Id.* at 246).

{¶28} Will Dhume ("Dhume"), the Assistant to the Pastor at Bible Baptist Church, testified that he and Burkard worked together at the church for several years. (June 4, 2024 Tr. at 11-12). Dhume testified that Burkard's duties included "anything [he and Pastor Stout] asked him to do" including cleaning the building, visiting church members, preaching, teaching the Bible, and "just anything to get in the dirt and the trenches[.]" (*Id.* at 12). Dhume recalled that Burkard would preach

by "giv[ing] the word of God . . . from the pulpit. . . just like. . . a preacher would do[.]" (*Id.*). Dhume testified that they tried to give him a broad view and to "[t]rain him up in ministry." (*Id.* at 13). Dhume stated that Burkard especially had a lot of influence with the teenagers in the church. (*Id.* at 14).

{¶29} Two church bulletins were presented by the State. In the first bulletin, dated March 27, 2022, under "Pastoral Staff," Pastor Stout was listed as the "Pastor" of the church, with Dhume listed as the "Youth Minister," and Burkard listed as "Assistant." (State's Ex. No. 4). Dhume defined the pastoral staff as "[a]nybody that works for the church . . . under the authority of [the] Pastor." (June 4, 2024 Tr. at 15). Specifically, they were "men [that would] be directly underneath [the] Pastor as far as [their] duties." (*Id.*).

{¶30} In the second bulletin, dated June 4, 2023, under "Church Staff" Pastor Stout was listed as "Senior Pastor," Dhume was listed as "Assistant Pastor," Burkard and Brian Pennington were listed as "Assistant," and Charlene Jones was listed as "Secretary." (State's Ex. No. 5). Dhume testified that Burkard and Dhume, as "Assistant[s]" were doing the same thing that the pastor would do, including preaching. (June 4, 2024 Tr. at 16). Dhume contrasted the positions of Dhume, Burkard, and Pennington with the position of the Secretary because the Secretary did not preach or teach as part of her employment with the church. (*Id.*). Likewise, members of the church who assist with activities such as passing out communion, as well as lay servants such as deacons and trustees are not members of the clergy

because they do not stand up and preach the word of God at a pulpit. (*Id.* at 28-29). Additionally, Dhume further clarified that, biblically, there is only one pastor of a church and that despite Dhume, Pennington, and Burkard erroneously being listed in the bulletin under different titles, their job titles technically should have been listed as "Assistant to the Pastor." (*Id.* at 25-26).

{¶31} Dhume stated that he considers himself to be a member of clergy and that he also considered Burkard to be a member of the clergy. (*Id.* at 17). Dhume testified that, in his opinion, clergy "preach and teach the word of God[,] . . . witness. . . [and] evangelize." (*Id.* at 17-18). Further, according to Dhume, when he was hired at the church, there was not any special training or education that he received to qualify him to be the assistant pastor, rather, it was his call from God to be a preacher. (*Id.* at 22). Likewise, no religious training or certification was required for Burkard's position as an "Assistant." (*Id.* at 22-23). Rather, the Pastor would take "anyone that felt a call of God." (*Id.* at 22). According to Dhume, Burkard was hired on at Bible Baptist Church to preach. (*Id.* at 25). Furthermore, the Pastor is ultimately the one who has the final say over the "hiring and firing." (*Id.* at 27).

{¶32} Courtney Stout ("Courtney"), Pastor Stout's wife, testified that Burkard was an assistant to the Pastor, and as such, represented the church. (June 4, 2024 Tr. at 31). When asked if Burkard was a member of the clergy at Bible Baptist Church, Courtney responded that "[a]solutely he was [a clergyman]." (*Id.*). According to Courtney, Burkard had the opportunity to train with Pastor Stout and

Dhume, who are also clergymen. (*Id.* at 43). Burkard's duties included teaching the Bible and representing the church in the community. (*Id.* at 44). According to Courtney, prior to opening Bible Baptist Church, Pastor Stout studied under a preacher and then became ordained to perform weddings that were legally recognized by the State of Ohio. (*Id.*).

{¶33} Further, O.H.'s mother testified that Burkard was "a leader in the church." (*Id.* at 47). O.H.'s father testified that his impression of Burkard's position at Bible Baptist Church was that he did "a little bit of everything" ranging from "preaching on a Sunday morning from the pulpit to being behind the pulpit with all ages of kids[.]" (*Id.* at 90). O.H.'s father's perception of Burkard's influence on Bible Baptist Church is that it was "big" especially with the younger adults and children. (*Id.* at 92).

{¶34} O.H.'s brother testified that Burkard was an "Assistant Pastor under [Dhume] and Pastor Jeremy and he was very involved in the Teen Room." (*Id.* at 110). When asked how many pastors were at Bible Baptist Church, O.H.'s brother answered that there were three –namely, Pastor Stout, Dhume, and Burkard. (*Id.*). O.H.'s brother recalled seeing Burkard preach on Sunday mornings, usually in the Youth Room. (*Id.* at 111).

{¶35} O.H. testified that she knew Burkard as a "family friend and a member of the clergy at our church." (June 4, 2024 Tr. at 126). O.H. recalled Burkard's duties in the church as an "assistant" of Pastor Stout and Dhume. (*Id.* at 166). O.H.

recalled Burkard teaching and preaching messages from the Bible. (*Id.*). O.H. stated that Burkard is a "leader" of the church and a lot of people found comfort in him, especially teenagers and young adults. (*Id.* at 166-167).

**{¶36}** Accordingly, we find that, viewed in a light most favorable to the State, sufficient evidence was presented at trial to allow the matter to proceed to the jury for a factual determination on this issue. We find that the jury had sufficient evidence from which to find that Burkard was a member of the clergy.

**{¶37}** Burkard's second assignment of error is overruled.

*Manifest Weight of the Evidence*

**{¶38}** In his first assignment of error, Burkard alleges that his convictions are against the manifest weight of the evidence. Specifically, he challenges the lack of physical evidence and eyewitness accounts of the incidents. Further, he challenges the credibility of O.H. and Joseph Seaunier ("Seaunier"). For the reasons that follow, we reject his arguments.

**{¶39}** First Burkard contends that his conviction was against the manifest weight of the evidence because there was a lack of "physical evidence" and eyewitness accounts of the incidents. However, "it is well established that physical evidence is not required to support a conviction for rape" or sexual battery against manifest weight challenges. *State v. Thomas*, 2018-Ohio-4345, ¶ 45 (2d Dist.). "'[T]here is no requirement, statutory or otherwise, that a rape victim's testimony be corroborated [by physical evidence] as a condition precedent to conviction.'" *In*

Case No. 14-24-36

*re J.N.*, 2024-Ohio-1727, ¶ 13 (12th Dist.), quoting *State v. Scarborough*, 1991 Ohio App. LEXIS 5533, *6 (Nov. 18, 1991). Furthermore, with respect to his contention that his convictions were against the manifest weight of the evidence because, other than O.H., there were no eyewitness accounts of the incidents described, we note that O.H. stated that Burkard took great pains to avoid others witnessing the sexual interactions, including parking in remote areas of the parking lot, quickly driving away when church members inadvertently came up on his vehicle, and dropping off O.H.'s brother at the gym before engaging in the behavior.

{¶40} Next, we turn to Burkard's argument that his conviction is against the manifest weight of the evidence because the trier of fact chose to believe O.H.'s version of events. Burkard alleges that O.H.'s statements to law enforcement and to the forensic interviewer were inconsistent. In support of his position, Burkard points to several minor inconsistencies in the version of events that O.H. provided to law enforcement and the forensic examiner and to inconsistencies between the testimony of O.H. and other witnesses.

{¶41} For instance, O.H. testified that after the last instance of sexual abuse, she asked her mother to drive her to her friend's house. (June 4, 2024 Tr. at 152-154). Once there, she changed into other clothes and purposely left the dress that she was wearing at her friend's house because it reminded her of the incident. (*Id.*). However, O.H.'s mother testified that O.H. walked to her friend's house rather than her mother driving her. (*Id.* at 58). But, on cross-examination, O.H.'s mother

-18-

testified that she could not be sure that she did not drive O.H. to her friend's house that night because, at the time, that night was not significant to her and she had driven O.H. to this friend's home many times before. (*Id.* at 84-85). Accordingly, the apparent inconsistency could be explained by the testimony.

{¶42} Other inconsistencies that Burkard points to are that O.H. told law enforcement and the forensic interviewer that the abuse had occurred approximately 15 to 20 times; however, she only specifically outlined four such incidents. First, we note that Burkard was not charged with other sexual assaults aside from the four that were detailed in the interviews.

{¶43} During her initial interview with law enforcement, O.H. stated that after the first time Burkard inserted his fingers in her vagina during the first day of VBS, it happened every day for the first week. However, in the forensic interview, she described the next event as occurring approximately one week later.

{¶44} Burkard also highlights O.H.'s testimony that she had developed a crush on Burkard around the time of the incidents and that she continued to care about him even after the incidents to "cast doubt on her motivations and willingness to be truthful about what may, or may not, have taken place." (Appellant's Amended Brief at 8). However, Burkard's trial counsel cross examined O.H. on the inconsistencies at trial and the jury would, accordingly, have been aware of any inconsistencies in O.H.'s testimony.

**{¶45}** Furthermore, O.H.'s testimony was corroborated by other sources. For instance, O.H.'s testimony that she and Burkard would drop her brother off at the YMCA to work out and that the sexual abuse would occur while her brother was at the gym was corroborated by the account information from the YMCA which showed her brother checking into the gym at approximately the times O.H. recalled the events happened with Burkard. Furthermore, multiple members of the church, including Pastor Stout and Dhume testified that Burkard was heavily involved at VBS that week.

**{¶46}** "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). "'Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact.'" *State v. Cox*, 2022-Ohio-571, ¶ 20 (3d Dist.), quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.), citing *DeHass*, 10 Ohio St.2d at paragraph one of the syllabus. "'The trier of fact is best able "to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proffered testimony."'" *State v. Brentley*, 2023-Ohio-2530, ¶ 33 (3d Dist.), quoting *Banks* at ¶ 13, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

**{¶47}** Notably, the jury had the opportunity to observe O.H. testify at trial. Based upon our review of the record, it is clear that the jury found O.H. to be credible. "[I]t is within the province of the jury to parse out the credible portions of the witnesses' testimonies[.]" *State v. Waller*, 2023-Ohio-493, ¶ 20. The record sufficiently supports the jury's credibility assessments, and we find no basis to alter its analysis.

**{¶48}** Finally, Burkard challenges the credibility of Seaunier's testimony that Burkard provided him information about his case when they were briefly incarcerated together at the Tri-County Jail. Specifically, Seaunier testified that when he and Burkard were incarcerated together for several days, Burkard confessed that he kissed and touched O.H. and put his hands on her breasts and vagina. Burkard testifies that Seaunier's testimony that he kissed O.H. is inconsistent with the rest of the testimony because O.H. did not mention Burkard kissing her when she described the incidents to the forensic examiner and law enforcement. However, as we stated with respect to Burkard's arguments relating to the credibility of O.H.'s testimony, the jury was in the best position to assess the credibility of Seaunier and was able to parse out the credible portions of his testimony. Furthermore, still photographs of surveillance footage from the jail depicted Seaunier and Burkard speaking on multiple occasions during their brief overlapping stays at Tri-County Jail, corroborating Seaunier's contention that he and Burkard engaged in some conversation during their overlapping time at the Tri-

County Jail. We also note that Seaunier's testimony is not necessarily at odds with O.H.'s testimony—while she did not discuss any kissing, she did not deny that it happened.

**{¶49}** After reviewing the evidence, we do not find that the jury lost its way and created a miscarriage of justice by finding Burkard guilty of rape and sexual battery.

**{¶50}** Accordingly, Burkard's first assignment of error is overruled.

### Third Assignment of Error

**The trial court erred when it permitted improper opinion testimony.**

**{¶51}** In his third assignment of error, Burkard argues that the trial court erred by permitting improper opinion testimony. Specifically, Burkard objects to Pastor Stout's testimony regarding whether Burkard was a cleric.

*Standard of Review & Relevant Law*

**{¶52}** "Evid.R. 701 grants the trial court wide latitude in allowing or controlling lay witness opinion testimony." *State v. Kehoe*, 133 Ohio App.3d 591, 630 (12th Dist. 1999). Appellate courts generally review the decision of the trial court concerning the admissibility of lay witness testimony for an abuse of discretion. *State v. Ollison*, 2016-Ohio-8269, ¶ 39 (10th Dist.). However, because Burkard did not object to the testimony to which he now assigns error, plain error

review applies.[3] To establish plain error, an appellant must demonstrate (1) an error, i.e., a deviation from a legal rule occurred; (2) the error is plain, i.e., it must be an obvious defect in the proceeding; and (3) the error affected substantial rights, i.e., the trial court's error affected the outcome of the proceeding. *State v. Morgan*, 2017-Ohio-7565, ¶ 2, 36-37, 52.

**{¶53}** Ohio Evid.R. 701 provides that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Plain error should be noticed only "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Obermiller*, 2016-Ohio-1594, ¶ 62, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus.

*Analysis*

**{¶54}** Burkard contends the trial court erred by permitting Pastor Stout to testify as to whether Burkard was a member of the clergy. In particular, Burkard challenges the State's line of questioning where the State provided Pastor Stout with a copy of the statute and asked him whether Burkard fit the definition of cleric.

---

[3] Burkard's trial counsel did object to the form of the question on the basis that it was a leading question—an objection that was overruled by the trial court. However, Burkard's counsel did not object in a manner so as to preserve the issue he is raising here. Accordingly, plain error review applies.

{¶55} Following defense counsel's cross examination of Pastor Stout, the trial court called the attorneys to the bench and raised concern regarding whether Burkard fit the statutory definition of a cleric, and the following conversation was had at the bench:

| [Trial court]: | I don't want to cross examine him but does anybody want to ask [Pastor Stout] the questions that are contained in the definition of a cleric? |
|---|---|
| [State]: | I will. |
| [Trial counsel]: | Say that again. |
| [Trial court]: | Is anybody going to ask him the questions that are contained in the definition of what a cleric is? |
| [State]: | I'll ask him. |
| [Trial counsel]: | I don't know that [Pastor Stout] knows what the [statutory] definition of a cleric is. |
| [State]: | I'm going to give it to him.  I'll do it. |

(June 3, 2024 Tr. at 240-241).

Then, the State, without objection from the defense, published the statutory definition of "cleric" to the jury and engaged in the following line of questioning:

| [State]: | Pastor Stout, I'm going to hand you what the Court has provided defense counsel and I.  It's a definition and you'll see it's from Revised Code [2317.02(C)(2)].  Can you see that as the words there where it says cleric? |
|---|---|
| [Pastor Stout]: | Yes, sir. |
| [State]: | And it says cleric means a member of the clergy. . . Do you see those words? |

[Pastor Stout]:      Yes, sir.

[State]:      Okay, I'm going to let you study that for a second and then I'm going to publish it to the jury. . . Pastor Stout, I direct your attention to where my finger is at here and I referenced the Revised Code Section right up there.  It says, as used in Division (C) of this section [a] cleric means a member of the clergy, a Rabbi[,] Priest, Christian Science Practitioner, or, and before we get to . . . your church, the Bible Baptist Church, is it a Christian Science church?

[Pastor Stout]:      No, sir.

[State]:      Does your church have a priest?

[Pastor Stout]:      No, sir.

[State]:      Does your church have a Rabbi?

[Pastor Stout]:      No, sir.

[State]:      But your church does have clergy?

[Pastor Stout]:      Yes, sir.

[State]:      Now . . . are you regularly ordained or accredited?  You, yourself?

[Pastor Stout]:      Yes, sir.

[State]:      Or a licensed minister of an established and legally cognizable church, [denomination] or [sect].  Are you a licensed minister?

[Pastor Stout]:      Yes, sir.

[State]:      Now, Brice Burkard, is he a licensed minister?

[Pastor Stout]:      No, sir.

[State]:          Is he licensed or ordained . . . is he regularly ordained, accredited?

[Pastor Stout]:   Accredited, yes . . . I gave him authority to do those things in the church.

[State]:          And then right here I'm going to focus on the word clergy. You're not a Rabbi or a priest. Correct?

[Pastor Stout]:   No.

[State]:          Are you a member of the clergy?

[Pastor Stout]:   Yes.

[State]:          Now, when we talk about a member of the clergy, members of the clergy stand up in front of the church and preach evangelizing messages?

[Pastor Stout]:   Yes, sir.

[State]:          What is an evangelizing message?

[Pastor Stout]:   To explain the gospel [of] Lord Jesus Christ and to educate and, hopefully, convert them to a belief in Jesus.

[State]:          Did Brice Burkard have those kinds of duties where he was talking about Jesus Christ and trying to bring others closer to Jesus?

[Pastor Stout]:   Absolutely.

[State]:          Did you see it yourself, sir?

[Pastor Stout]:   Yes.

. . .

| [State]: | You stated that you are accredited. You are licensed and then you hire people to help teach and train under your license? |
|---|---|
| [Pastor Stout]: | Yes, sir. |
| [State]: | Is that what you did with Brice Burkard? |
| [Pastor Stout]: | Yes, sir. |
| [State]: | Did you ever give Brice Burkard any instruction on how to deliver evangelizing messages? |
| [Pastor Stout]: | Yes. |
| [State]: | What kind of instruction did you give him? |
| [Pastor Stout]: | Bible doctrine. [A]dvice on how to . . . effectively get those messages across. Study the Bible to know how to answer questions and to direct the interpretation of the Bible. |
| [State]: | Pastor, was Brice Burkard, as an employee of the Bible Baptist Church, active as a member of the clergy as defined by that Statute from your perspective? |
| [Pastor Stout]: | Yes, sir. |
| [Defense counsel]: | Objection. Leading, Your Honor? |
| [Trial court]: | Overruled. I'll allow it. |
| [Pastor Stout]: | Yes, sir. |

(June 3, 2024 Tr. at 241-246).

{¶56} Defense counsel then engaged in a brief recross examination of Pastor Stout where he confirmed that Burkard only had a high school diploma and "didn't

have any additional education or training in order to be hired into his position." (June 3, 2024 Tr. at 246).

{¶57} Here, Burkard assigns error to the referenced testimony on the grounds the testimony that Pastor Stout gave, regarding his opinion on whether Burkard fit the statutory definition of a cleric, was impermissible. However, after reviewing the testimony in concert with Evid.R. 701, we disagree.

{¶58} First, Pastor Stout's testimony is "rationally based on [his] perception." Notably, Pastor Stout testified that as the pastor of the church, he was the one that hired Burkard and was responsible for overseeing his work as an employee of the church. Accordingly, the testimony that Pastor Stout gave regarding the scope of Burkard's employment was based on Pastor Stout's personal knowledge of the position that Pastor Stout himself held as the pastor of the church and Burkard's role as his subordinate and as an employee of the church.

{¶59} Secondly, Pastor Stout's testimony was "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Pastor Stout, as the pastor of the church and Burkard's supervisor was in the best position to testify regarding the scope of Burkard's employment, and the perception that he had regarding Burkard's authority in the church.

{¶60} Furthermore, even if it was error for Pastor Stout to offer his opinion that Burkard fit the statutory definition of a "cleric," Burkard has not proven that but for the alleged error, the outcome of the trial clearly would have been otherwise.

Notably, as discussed in great detail with respect to Burkard's challenges to the sufficiency and weight of the evidence, a number of witnesses testified to their knowledge regarding Burkard's role at the church, including the scope of his employment as clergy. Thus, even without Pastor Stout's opinion whether the scope of Burkard's role at the church fit the statutory definition of a cleric, the jury still could have found that Burkard fit the statutory definition of a "cleric" at the time the offenses were committed.

{¶61} Burkard's third assignment of error is overruled.

### Fourth Assignment of Error

**Appellant's right to a fair trial and due process was violated by the trial court's failure to protect his right to a trial by a fair and impartial jury.**

{¶62} In his fourth assignment of error, Burkard argues that his right to a fair trial and due process were violated by the trial court's alleged failures to protect his right to a fair trial and impartial jury. In support of his position, Burkard alleges that his right to a fair trial and due process were violated in two ways. First, he contends a statement made by one of the potential jurors during voir dire was prejudicial. Second, Burkard alleges that comments regarding the case that a juror made to her neighbor between the first and second days of trial violated his right to a fair trial. Burkard reasons that the two instances amounted to a violation of his right to a fair trial before a fair and impartial jury. Burkard contends that, although

neither party made a motion for a mistrial as a result, the trial court should have recognized the alleged prejudice and sua sponte declared a mistrial. We disagree.

*Standard of Review and Applicable Law*

{¶63} A trial court may grant a mistrial sua sponte when "'there is manifest necessity'" for the mistrial or when "'the ends of public justice would otherwise be defeated.'" *Cleveland v. Walters*, 98 Ohio App.3d 165, 168 (1994), quoting *State v. Abboud*, 13 Ohio App.3d 62. "The granting of a mistrial rests within the sound discretion of the trial court, in recognition that the trial judge is in the best position to determine whether the situation at hand warrants such action." *State v. Roman-Navarre*, 2025-Ohio-3156, ¶ 43 (5th Dist.), citing *State v. Glover*, 35 Ohio St.3d 18 (1988) and *State v. Hessler*, 90 Ohio St.3d 108, 115-116 (2000). "Mistrials should only be granted in those situations in which a fair trial becomes impossible." *State v. Risner*, 2019-Ohio-4120, ¶ 40 (3d Dist.). "However, when a defendant fails to move for a mistrial at all once he discovers the grounds that would form the basis for this motion, he forfeits all but a claim of plain error." *Id.* "For this Court to notice plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial." *Id.* at ¶ 41. "Moreover, 'even when the minimum requirements have been met, a reviewing court should still be conservative in its application of plain-error review, reserving notice of plain error for situations involving more than merely

theoretical prejudice to substantial rights.'" *Id.*, quoting *State v. Steele*, 2013-Ohio-2470, ¶ 8.

**{¶64}** Burkard's first argument relates to statements made by a potential juror, which Burkard alleges were so prejudicial that they violated his right to a fair trial. The potential juror, who was not ultimately seated on the jury, engaged in the following exchange with the prosecutor:

| | |
|---|---|
| [State]: | Is there anybody here [thinking] man, I wish [the prosecutor] would ask me that question? Anybody? To help me determine, to help [Burkard's defense counsel] determine, are you a juror that can be fair and impartial? Is there anybody wondering why I didn't ask a particular question? |
| [Potential Juror ]: | [Name], yes, [Potential Juror]. I just was saying like I agree that, um, I have a lot of experience and training. I work for a hospital, as well, but I think this case is very interesting. Um, I attend church. My husband is on staff with our church. Um, I was a Foster parent a long time ago. I've done different training for watching for evidence of a person who has been assaulted. Um, I worked at the school for a long time so I do think that there are signs that you can see especially for a parent to see in a child if they have been assaulted in some way. Um and I think was it - - is it Pastor Brice, you know, is there a history with this man that he's done this to other people, as well. So I think the case is very interesting. |
| [Trial court]: | So you're Number 43. Is that correct? |
| [Potential Juror]: | Yes. |
| [Trial court]: | Your last name, again? |

| [Potential Juror]: | [Repeats last name.] So, I think, it would be interesting to hear, um, both sides of the story and to hear the evidence that has been presented. So, yes, I'm thankful to be here. |
| --- | --- |
| [State]: | And all of that that you shared is indicative or confirmation that you can be both fair and impartial? |
| [Potential Juror]: | Yes. |
| [State]: | Thank you. Thank you for your time. I have no further questions. |

(June 3, 2024 Tr. at 42-43).

**{¶65}** Burkard argues that the above exchange prejudiced the jury to such an extent as to deprive him of a fair trial. We disagree.

**{¶66}** We do not find that the potential juror's statements violated Burkard's right to a fair trial. Burkard invites us to interpret the potential juror's statements as accusing Burkard of having a history of engaging in sexual conduct with underage individuals; however, taken within the context of the proceedings, we find Burkard's position to be unavailing. Indeed, the plain interpretation of the statements of the potential juror is that she was interested in the case, in part, due to her own life experiences, and that she believed that she could be a fair and impartial juror. We find Burkard's allegation that the potential juror's statements prejudiced the jury and deprived him of a fair trial to be unfounded.

**{¶67}** Next, Burkard contends he was deprived of a fair trial as a result of a conversation between a juror and her neighbor, who was an employee of the

Case No. 14-24-36

Prosecutor's Office.  Specifically, at the beginning of the second day of the trial, the court was made aware that one of the jurors discussed the case with her neighbor. The court brought in the juror for a discussion outside of the presence of the rest of the jury.

| | |
|---|---|
| [Trial court]: | We're on the record.  The Defendant and [his trial counsel] are here.  [The State] is here. We've asked juror number 14 . . . to come out. How are you today? |
| [Juror No. 14]: | I'm well.  Thank you, sir. |
| [Trial court]: | Okay.  That you, evidently, are neighbors with [an employee of the Prosecutor's Office] and yesterday you told her that you were on the Jury and made some comments about the case.  Do you [recall the] basic question we had before was whether or not you could be fair and impartial. Do you still feel that you can be fair and impartial in this case? |
| [Juror No. 14]: | Yes, Judge, I do. |
| [Trial court]: | Either counsel have any questions? |
| [State]: | [Juror No. 14] can you tell us what the contents of your comments were to . . . your neighbor, who also works at the Prosecutor's Office? |
| [Juror No. 14]: | Yes.  Yeah, absolutely.  She - - prior to being selected for jury duty, she had given me some guidance as far as what the process was going to be like.  So, yesterday as I was walking in, I had advised her that I was selected for jury duty.  I mentioned that it was a civil [sic] case and that was really just the extent of it.  She had asked how things were going.  I said it was, basically, they're - - just was an initial conversation |

regarding some of the witnesses but we didn't go into depth or detail regarding any case, any of the matter, um, basically anything regarding what was presented in the Court and that was the extent of the conversation.

[State]: If I told you that it was relayed that you had made a comment about some of the exhibits that had been tendered yesterday . . . what would be your response to that?

[Juror No. 14]: I had mentioned that there were a lot of exhibits that were presented and that was the extent of it.

[State]: Did you have any questions - - did you ask . . . your neighbor, whether or not - - did you make a statement that you didn't understand why some of the exhibits had been presented?

[Juror No. 14]: I don't recall in that conversation. I just had indicated that there were quite a few exhibits that had been presented. So, but I don't recall making that specific comment.

[Trial court]: Thank you, [State]. [Defense counsel]?

[Trial counsel]: Just a couple questions, please.

[Juror No. 14]: Yes.

[Trial counsel]: Do you recall the Judge admonishing you and your fellow jurors not to discuss the case at all with anybody?

[Juror No. 14]: Yes, there was conversation regarding that.

[Trial counsel]: Okay. So, I guess, I'm having a hard time, if you remember that, why was it you were discussing the case with her?

[Juror No. 14]: [Unfortunately], I have a level of comfort with her and, you know, I didn't think that indicating

that I had been selected for the Jury, um - - unfortunately, . . . I didn't think anything of it. It was more in passing conversation knowing that she was a member of this Court.

[Trial counsel]: Okay. Last question then. From this point forward, can you promise to the Court that you will not discuss the case with anybody else? Neighbors, friends, relatives, husbands - -

[Juror No. 14]: Yes.

[Trial counsel]: - - just as he ordered.

[Juror No. 14]: Yeah, I absolutely can assure you that that will not happen.

[Trial counsel]: That's all, Your Honor.

[Trial court]: Anything else, counsel?

[State]: It was stated to me that I'm talking too loud or you had made the comment allegedly to your neighbor . . . that I'm speaking loud. Is that accurate?

[Juror No. 14]: Yes.

[State]: Okay. And does that cause you to be bias[ed]?

[Juror No. 14]: No, not at all. It was just I was overwhelmed by the room and how loud everything was and so it was just an off-the-cuff comment that was made.

[State]: If I told you I'm fighting a cold, would that help explain as to perhaps I'm not even hearing as I usually would?

[Juror No. 14]: No, it wasn't meant to be an insult or anything like that. It was just regarding the overall just, I think, feel of the courtroom.

Case No. 14-24-36

[Trial court]: Thank you, [State]. [Bailiff], if you would bring in the other jurors. Thank you.

(June 4, 2024 Tr. at 6-10).

**{¶68}** Burkard argues that his due-process rights were violated because the trial court did not sua sponte declare a mistrial after the incident or remove Juror Number 14 and replace her with another juror.

**{¶69}** We disagree. There is no indication in the record that the conversation between the juror and her neighbor affected the outcome of the trial. Notably, the State and defense counsel questioned Juror Number 14 regarding the conversation and her ability to remain unbiased and appeared to be satisfied with her responses. Furthermore, the juror's responses to the questions indicated that she believed that she could remain unbiased, despite her conversation with her neighbor.

**{¶70}** In conclusion, we do not find that either of the circumstances created an obvious defect in the trial proceedings that affected the outcome of a trial. Significantly, Burkard has not demonstrated that there is a real prejudice, rather than "merely theoretical prejudice" to his substantial rights. *Steele*, 2013-Ohio-2470, at ¶ 30.

**{¶71}** Burkard's fourth assignment of error is overruled.

**Fifth Assignment of Error**

**Appellant received ineffective assistance of counsel to a degree that he did not receive a fair trial.**

-36-

**{¶72}** In his fifth assignment of error, Burkard argues that he was denied the right to a fair trial due to his counsel's ineffective representation. In support of his contention that his trial counsel was ineffective, Burkard argues that his trial counsel failed to: (1) address the alleged "prejudicial statements regarding other bad acts" a potential juror made during voir dire and (2) failed to request a mistrial or that the juror be excused when he learned that the juror had a conversation with her neighbor about the case. Further, Burkard argues that his trial counsel was ineffective for failing to object when the video of O.H.'s forensic interview appearing to reference another potential victim of Burkard was not timely stopped before O.H. referenced another potential victim.

**{¶73}** "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 2020-Ohio-3072, ¶ 45 (12th Dist.). A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong

presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

**{¶74}** Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**{¶75}** With respect to Burkard's arguments relating to the juror and potential juror, in our discussion of Burkard's fourth assignment of error, we addressed those arguments and found no violation of Burkard's due process rights. Accordingly, we reject his argument that his trial counsel was ineffective for not addressing the potential juror's comments during voir dire and not requesting a mistrial or for the juror to be excused after learning she had a conversation with her neighbor during the trial.

**{¶76}** With respect to his argument that he received ineffective assistance of counsel for his trial counsel failing to object to a portion of O.H.'s forensic interview played to the jury, we likewise find that argument to be unavailing.

**{¶77}** In support of his position, Burkard references a portion of State's Exhibit 2, O.H.'s forensic interview, which was played for the jury. Specifically, Burkard references O.H.'s response to two questions from the forensic interviewer:

[Interviewer]:      Tell me how you broke it off.

[O.H.]:      I didn't, like, tell him initially like this is over with. I just stopped . . . riding in a car with . . . him and [my brother] or whatever. [Burkard] would be like, hey, you want to go with me and [your brother][?] I would just say, no, I'm busy. Like, I had basketball . . .and just, like, come up with something to make - - I think he finally got the hint and then he - - 'cuz he started doing this to another girl so he just, like, moved on, I would say.

[Interviewer]:      Okay. Did you ever see him do this with someone else?

[O.H.]:      No, but I told my mom - - sometimes my mom would say not like that - - because she didn't tell me like who the victim was but I figured out who it was last - -

(State's Exhibit 2); (June 3, 2024 Tr. at 155-156). The record indicates that, at that point, the recording was stopped abruptly and the final few minutes of O.H.'s forensic interview were not played for the jury.

**{¶78}** However, based on the strength of the State's case against Burkard, even if we presumed deficient performance for failing to object or protect against inadvertent disclosure of potential other victims, we do not conclude that the playing of the portion of the forensic interview resulted in prejudice. *See State v. Johnson*, 2019-Ohio-1355, ¶ 6 (8th Dist.) (overwhelming evidence of guilt precludes a

finding of prejudice under the second prong of the *Strickland* test). An "appellate court does not need to consider the facts of the case under both prongs if the appellant makes an insufficient showing on one." *State v. Shoaf*, 2022-Ohio-3605, ¶ 49 (3d Dist.). Accordingly, having determined that Burkard has failed to demonstrate prejudice, we need not address Burkard's arguments with respect to the first prong of the *Strickland* analysis.

{¶79} Burkard's fifth assignment of error is overruled.

*Conclusion*

{¶80} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Union County Court of Common Pleas.

***Judgment Affirmed***

**WALDICK, P.J., concurs.**

**WILLAMOWSKI, J., concurs in Judgment Only.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

Mark C. Miller, Judge

Juergen A. Waldick, Judge

John R. Willamowski, Judge
Concurs in Judgment Only

DATED:
/jlm