[Cite as *State v. McWay*, 2018-Ohio-3618.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY


STATE OF OHIO,

           **CASE NO. 1-17-42**

      **PLAINTIFF-APPELLEE,**

      **v.**

**ROSS M. MCWAY,**             **O P I N I O N**

      **DEFENDANT-APPELLANT.**


**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR20170036**

**Judgment Affirmed**

**Date of Decision:  September 10, 2018**


**APPEARANCES:**

    *Nikki Trautman Baszynski* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Ross M. McWay ("McWay") appeals the judgment of the Allen County Court of Common Pleas, alleging (1) that the trial court erred in denying his motion for a mistrial; (2) that his conviction for aggravated murder was against the manifest weight of the evidence; and (3) that he was denied his right to the effective assistance of counsel. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} McWay had been in a relationship with Wendy Jeffers ("Jeffers") for about one year as of January, 2017. Tr. 261, 364-365. In 2016, McWay was incarcerated, awaiting a trial scheduled on a charge not related to this present case. Tr. 249. An inmate incarcerated with McWay, Casey Smith ("Smith"), later testified at trial that Jeffers visited McWay at the jail on January 1, 2017, and broke up with him. Tr. 244. Smith also testified that, after McWay had this conversation with Jeffers, McWay told him that he was going to kill Jeffers when he was released from prison by "chok[ing] her out" and that he was "going to wear a sleeve on his arm so no DNA would show * * *." Tr. 243-244. Two other inmates—Tyler Bradford ("Bradford") and Anthony Lehman ("Lehman")—testified at trial that they heard McWay make these statements to Smith. Tr. 293-294, 354.

{¶3} On January 13, 2017, McWay was released from jail after he was tried and acquitted of the charge against him. Tr. 367. IC, Jeffers's son, testified at trial

that he saw McWay on his mom's property on the evening of January 13, 2017. Tr. 262. The next day, on January 14, 2017, IC went to spend the night at his cousin's house. Tr. 264. He testified at trial that his mom was home alone Saturday evening. Tr. 268. Around 9:00 P.M. on January 14, 2017, Jeffers texted IC and indicated that McWay was coming to her house to pick up some clothing. Tr. 264. Jeffers asked IC where the clothes were, and IC called Jeffers to tell her where the clothes had been stored. Tr. 264.

{¶4} On January 15, 2017, Genevieve Dunlap, a communications officer with the Lima Police Department, received a call at work in which the caller requested a welfare check on Jeffers. Tr. 210-211. The caller worked with Jeffers and indicated that Jeffers had not been at work. Tr. 211. In response to this call, Patrolmen Cory Noftz ("Noftz") and Chad Kunkleman ("Kunkleman") were dispatched to Jeffers's home in Lima, Ohio. Tr. 223. After attempting to make contact with Jeffers, Noftz and Kunkleman entered Jeffers's home and found Jeffers's body in her bathroom. Tr. 223, 224. Her body was slumped over the side of her bathtub with her back facing the bathroom door. Tr. 225. An identification officer for the Lima Police Department, Michael Carman ("Carman"), testified at trial that Jeffers's body was leaning over the side of the tub; that the tub was not filled with water; and that her hair was wet. Tr. 314. Jeffers's shorts were bunched up as though she was pulled to the edge of the bathtub. Tr. 372. Carman also testified that the house did not show any signs of forced entry. Tr. 316.

{¶5} After the patrolmen had secured the area, Kunkleman was approached outside the house by IC, who had just been notified of his mother's death. Tr. 264, 266. IC indicated to Kunkleman that McWay had gone to Jeffers's house on the night of Saturday, January 14, 2017, in order to get some of his clothes from Jeffers. Tr. 238, 264. Danielle Holland ("Holland") was interviewed by the police as she was acquainted with McWay. Ex. 46. She told Detective Steve Stechschulte ("Detective Stechschulte") that McWay spent the night of January 14, 2017, with her at a friend's house. Tr. 347. Holland then told Detective Stechschulte that McWay left at around midnight on Saturday night and returned to the house roughly three hours later. Ex. 46. Tr. 394, 400. At trial, Holland testified that she could not recall these details but did eventually admit that McWay left the house they were staying at late at night on January 14, 2017, and returned several hours later. Tr. 348.

{¶6} On January 18, 2017, an autopsy was performed by Dr. Diane Scala-Barnett ("Dr. Scala-Barnett") on Jeffers. Tr. 378. The autopsy revealed that Jeffers died of strangulation. Ex. 44. Tr. 453. Jeffers also had bruises on her chin, right eye, right hand, left elbow, lower legs, and lip. Ex. 43. Jeffers's hyoid bone was fractured, indicating that there was "lateral compression—side to side compression" across her throat. Tr. 441. On January 19, 2017, McWay sat down for an interview with Detective Stechschulte ("Detective Stechschulte"). Tr. 387. Ex. 46. During this interview, McWay stated the following:

**McWay: I couldn't get outta there. I just, I wanted to go but I didn't want to go but like I said, things weren't goin' nowhere. The conversation, it wasn't like the one the night before when it was all lovey dovey and yeah, yeah, yeah. There was never no decisions, so. We just kept goin' back and forth a little bit with words, harsh words, but just "you cheated on me. You ripped my soul out. I loved you more than any other guy. I left my family to be with you. You made me look like an a\*\*." Then we sat back down on the couch. She tried to get back up; she grabbed me again, so I just put my hands around her throat. I was tellin' her I'm going to leave. I just didn't realize the strength that I had in it. And then she just kind of fell over a little bit, like halfway and was just looking at me.**

**\* \* \***

**Detective Stechschulte: So what did you do next?**

**McWay: I was callin' her name and telling her to wake up. I didn't mean for things to go this way. It wasn't supposed to go that way. It wasn't supposed to go that way.**

**\* \* \***

**It was an accident. I just, I—I didn't, I didn't know the strength I was puttin' on her and—and when she passed out and wouldn't respond I was just like f\*\*\*, f\*\*\*, f\*\*\*.**

Ex. 46. An edited version of this interview was admitted at trial. Ex. 46.

{¶7} Shortly after Jeffers's body was found, three inmates, who had been in jail with McWay in January of 2017, got in contact with Detective Stechschulte. Tr. 251. All three of these inmates—Smith, Lehman, and Bradford—told Detective Stechschulte that McWay said he was going to strangle Jeffers when he was released from jail. Tr. 244, 293-294, 354. On January 27, 2017, McWay was charged with one count of aggravated murder in violation of R.C. 2903.01(A). Doc. 1. After his

trial, on August 31, 2017, the jury found McWay guilty of one count of aggravated murder in violation of R.C. 2903.01(A). Doc. 95. He was sentenced on the same day. Tr. 453. Appellant filed his notice of appeal on October 2, 2017. Doc. 106. On appeal, appellant raises the following assignments of error:

**First Assignment of Error**

**The trial court erred when it denied Ross M. McWay's request for a mistrial.**

**Second Assignment of Error**

**Ross M. McWay's aggravated-murder conviction was against the manifest weight of the evidence.**

**Third Assignment of Error**

**Trial counsel rendered ineffective assistance at sentencing.**

*First Assignment of Error*

**{¶8}** In his first assignment of error, McWay argues that the trial court erred in denying his motion for a mistrial. The basis of this motion was an allegedly prejudicial statement made by a witness for the State.

Legal Standard

**{¶9}** "Mistrials are necessary 'only when the ends of justice so require and a fair trial is no longer possible.'" *State v. Welch*, 3d Dist. Wyandot No. 16-06-02, 2006-Ohio-6684, ¶ 9, quoting *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 131. "[A] mistrial should not be ordered merely because some error or irregularity had intervened." *State v. Carter*, 3d Dist. Allen

-6-

No. 1-15-62, 2017-Ohio-1233, ¶ 71. "The decision regarding whether to declare a mistrial is left within the discretion of the trial court." *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 21.

{¶10} "Thus, a trial court's decision to deny a motion for a mistrial will not be reversed absent an abuse of discretion." *State v. Randle,* --- N.E.3d ---, 2018-Ohio-207, ¶ 29 (3d Dist.). "An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary, or capricious." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23, quoting *Heilman v. Heilman*, 3d Dist. Hardin No. 6-12-08, 2012-Ohio-5133, ¶ 14. "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." *State v. Thompson*, 2017-Ohio-792, 83 N.E.3d 1108, ¶ 11 (3d Dist.), quoting *In re Jane Doe 1*, 57 Ohio St.3d 135, 138, 566 N.E.2d 1181 (1991).

Legal Analysis

{¶11} McWay argues that a statement Smith made during his testimony was grounds for a mistrial. This is the portion of Smith's testimony that was identified by McWay on appeal:

> **[Prosecutor]: And why did he say he was going to use—and maybe you said it and I didn't hear—why did he say he was going to cover up his arm?**
>
> **[Smith]: Because he already had a body and he didn't want—**
>
> **[Prosecutor]: Because what?**

-7-

> **[Smith]: He already had a body on his case. He already had a body.**

> **[Defense Counsel]: Objection, your Honor. Can we approach?**

Tr. 246. At this point, the Defense made a motion for a mistrial, which the trial court overruled. Tr. 247-248. McWay argues on appeal that this was a prejudicial reference to his prior conviction for manslaughter.

{¶12} However, the content of this statement was seemingly ambiguous as is seen by the fact that the prosecutor did not understand the meaning of Smith's words. Further, at a sidebar, the prosecutor stated that she did not intend to elicit this statement from Smith and that Smith was not told to make this statement. At the request of the Defense, the trial court then issued the following curative instruction:

> **[Trial Court]: Ladies and gentlemen of the jury, I'm going to instruct you to disregard the response to the last question. When I say disregard it, that means you cannot consider the response to the last question. There has been some discussion about the defendant, Mr. McWay, being in jail with this witness and that he had a trial. He was acquitted after that trial of the offense for which he was charged in that case. But disregard the response to the last question.**

Tr. 249.[1] "[I]f the trial court issues curative instructions regarding a comment mentioning the silence of the defendant, we presume that the jury adhered to the

---

[1] In the latter half of this curative instruction, the trial judge was referring to the January 2017 trial in which McWay was acquitted of criminal charges. The jurors were aware that McWay was in jail awaiting trial in January of 2017 because Smith, Bradford, and Lehman testified about conversations that they had with McWay while incarcerated. The jurors were unaware of what the charges were against McWay in the January 2017 trial, adding another layer of ambiguity to Smith's allegedly prejudicial statement.

trial court's instructions." *State v. McDowell*, 3d Dist. Hancock No. 5-17-01, 2017-Ohio-9249, ¶ 21. McWay's arguments on appeal have not given us a reason to dispense with this presumption. We also do not find any indications in the record that the trial court abused its discretion in denying McWay's motion for a mistrial. For these reasons, McWay's first assignment of error is overruled.

*Second Assignment of Error*

{¶13} In his second assignment of error, McWay argues that his conviction is against the manifest weight of the evidence. Specifically, he challenges the jury's finding of purposefulness, which is a required element of aggravated murder, because the evidence for this element came from three inmates.

Legal Standard

{¶14} "When 'deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion.'" *State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist.1997). "In a manifest weight analysis, 'the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost

its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

{¶15} "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist.1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

{¶16} In this case, McWay was charged with aggravated murder in violation of R.C. 2903.01(A). In order to prove this crime, the prosecution had to show that McWay "[1] purposely, [2] and with prior calculation and design, [3] cause[d] the death of another." R.C. 2903.01(A).

> **The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated**

**decision or a studied consideration of the method and the means to cause a death.**

*State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18.

**We traditionally consider three factors in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'"**

*Id.* at ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). However, "there is no 'bright-line test that emphatically distinguishes between the presence or absence of "prior calculation and design." Instead, each case turns on the particular facts and evidence presented at trial.'" *Id.* at ¶ 19, quoting *Taylor* at 20.

Legal Analysis

{¶17} At trial, the State called three inmates, who were incarcerated with McWay prior to McWay's release from jail in January of 2017, as witnesses. First, Smith testified that he, on January 1, 2017, was sitting next to McWay during visitation when Jeffers came to speak with McWay. Tr. 252. Smith testified that he overheard McWay say, "Are you serious? You're breaking up with me?" Tr. 244, 253. He then said he heard McWay say, "It's over." Tr. 253. Smith testified that, later, McWay told him that, "My woman's [Jeffers] cheating on me." Tr. 243. McWay continued, saying, "So, when I get out I'm going to kill her. If I can't have

-11-

her, nobody can have her." Tr. 243. McWay reportedly said that he was going to "choke her out" while "wear[ing] a sleeve over her arm" because McWay believed this would help him to avoid leaving DNA evidence at the scene. Tr. 243. On cross-examination, Smith stated that he was in prison for kidnapping and that he entered into a plea agreement in March 2017. Tr. 250. He also stated that he was not offered anything in exchange for his testimony against McWay. Tr. 249.

{¶18} Second, Lehman testified at trial that he also was in the county jail while McWay was awaiting his trial in January of 2017. Tr. 292. McWay indicated that another prisoner told him that "[McWay's] girl [Jeffers] had all types of dudes pulling up at her house and going in and out." Tr. 293. Lehman then testified that McWay then said that

> **he's getting out and nobody knows he's getting out but his brother, and his brother is picking him up, and if he catches that bitch cheating that he was going to fuck her up. He had told—told us how he was going to put a sleeve on and choke her out.**

Tr. 293. He then testified that McWay said he had "to put a sleeve on so you don't get none of your hairs, nothing from you, on to the person you're choking out." Tr. 293-294. Lehman admitted at trial that he was in prison for robbery. Tr. 290. He also had other felony convictions, including corrupting another with drugs and theft of property. Tr. 290. He stated that he was not offered anything during plea negotiations in exchange for his testimony against McWay. Tr. 291.

**{¶19}** Third, Bradford then testified that he was in the county jail in January of 2017. While McWay was talking to Smith, Bradford was walking to the restroom. He testified that he overheard McWay say that "he was going to kill that girl and wear something long-sleeved on his arm." Tr. 355. He also testified that McWay said "he was going to wear something to protect his hair or something." Tr. 356. Bradford admitted that he was incarcerated for felonious assault and also had a felony "cocaine charge" on his record. Tr. 356. He also testified that he did not have any preferential treatment in exchange for his testimony. Tr. 357.

**{¶20}** McWay, on the other hand, made statements to Detective Stechschulte that indicated Jeffers's death was accidental. Ex. 46. During the interview, the following relevant statements were made:

> **Detective Stechschulte: first of all, was it—was it an accident? I mean it wasn't one of these 'if I can't have you, no one's gonna have you' type things, right?**
>
> **McWay: No.**
>
> **\* \* \***
>
> **Detective Stechschulte: How many times did you hit her?**
>
> **McWay: I didn't hit her none.**
>
> **Detective Stechschulte: This [gesturing to his face] was all beat up dude.**
>
> **McWay: I had to defend from all the pushin' because after we went into the living room—the pushin' just kept going on. And all I would do is this—like this [gesturing]. Just pushin' her back**

-13-

up off me, pushin' her back up off me.  So finally I just kind of threw her on the couch like.

Detective Stechschulte: Then what happened?

McWay: And she came at me again and I just put my hand up like this and went around her neck and I shoved her on the couch. She said, "now you're goin' to put your hands on me." I said, "you're not lettin' me leave.  What do you want me to do?  If we're not goin to be together, I'm not goin' to stay here."

\* \* \*

Detective Stechschulte: Then what happened?

McWay: I couldn't get outta there.  I just, I wanted to go but I didn't want to go but like I said, things weren't goin' nowhere. The conversation, it wasn't like the one the night before when it was all lovey dovey and yeah, yeah, yeah.  There was never no decisions, so.  We just kept goin' back and forth a little bit with words, harsh words, but just "you cheated on me. You ripped my soul out.  I loved you more than any other guy.  I left my family to be with you. You made me look like an a\*\*."  Then we sat back down on the couch.  She tried to get back up; she grabbed me again, so I just put my hands around her throat.  I was tellin' her I'm going to leave.  I just didn't realize the strength that I had in it.  And then she just kind of fell over a little bit, like halfway and was just looking at me.

Detective Stechschulte: And she was dead then?  Or was she still alive at that point gasping for air?

McWay: Then she was goin' out of it.  I don't know.

\* \* \*

Detective Stechschulte: Did she die on that couch?  Yeah?

McWay: [Nods affirmatively]

\* \* \*

-14-

**Detective Stechschulte: How long do you think you guys sat or you sat in the living room thinkin' what to do before you moved her?**

**McWay: Probably fifteen minutes. I don't know. I didn't want to leave her there, but I didn't know what to do.**

**Detective Stechschulte: What gave you the idea to do what you did—how you left it? Sure that was the only way of possibly making it look like it wasn't a murder? Yeah?**

**McWay: I didn't murder her.**

**Detective Stechschulte: Well, I know, but they were going to look at it and see it that way, you know.**

**McWay: It was an accident. I just, I—I didn't, I didn't know the strength I was puttin' on her and—and when she passed out and wouldn't respond I was just like f\*\*\*, f\*\*\*, f\*\*\*.**
**\* \* \***

**Detective Stechschulte: And then the autopsy also showed that she got grabbed up around her neck, which is close to what you were sayin, but not like this [gestures as though he was strangling someone from the front]. It was like this [gestures as though he is strangling someone from behind].**

**McWay: I was never behind her at any point.**

**Detective Stechschulte: Okay. All right. And that could be right. I don't know. I don't know that. But the one thing that was conclusive and for sure is that she didn't sit in that front room for 15 minutes. She was still gaspin for f\*\*\*\*\*\* air when her face went down into the water. Because not only was her \*\*\* bone broken from extreme pressure to her throat—she was gonna die from that most likely, all right. But for good measure you put her face down into the water. Whether it was the toilet water or the bath water, I don't know. It was one of them. And she was still gaspin at that point. She sucked water up into her nasal cavity. The only way that water can get up into that nasal cavity is before she's dead. Post mortem it doesn't end up there.**

**McWay: She wasn't responding to me.  I don't know.**

**Detective Stechschulte: Well, she wasn't dead yet.**

Ex. 46.

{¶21} Dr. Scala-Barnett testified that Jeffers died of strangulation from a lateral compression across her throat.  Tr. 450, 453.  She agreed that this finding "would be consistent with somebody taking an arm and putting it around someone." Tr. 451.  Dr. Scala-Barnett testified that a person with this type of compression on his or her throat would be unconscious after roughly thirty seconds and would expire after roughly three to five minutes.  Tr. 451.  She stated that she was able to determine, from the autopsy, that Jeffers's bodily injuries occurred before her death and that Jeffers died shortly after her hyoid was fractured.  Tr. 453.  Towards the end of her testimony, Dr. Scala-Barnett stated that Jeffers had some water in her sphenoid sinus, indicating that Jeffers was "submerged at some point."  Tr. 452. She stated that this water would not have entered this area of the sinus passively and would likely have to be an agonal—near death—breath or a compression from placing Jeffers over the side of the bathtub that was filled with water.  Tr. 452.

{¶22} The testimonies of Smith, Lehman, and Bradford indicate that McWay discussed his intent to strangle Jeffers after his release from prison.  McWay's version of Jeffers's final moments contradicts these accounts.  However, the evidence from the autopsy was inconsistent with McWay's account—McWay

-16-

asserted that he "was never behind her at any point." Ex. 46. Tr. 450, 453. The jurors were free, as the finders of fact, to believe or disbelieve the testimony of Smith, Lehman, and Bradford. *State v. Caldwell*, 79 Ohio App.3d 667, 679, 607 N.E.2d 1096 (1992) (holding "the jury is free to believe all, part or none of the testimony of each witness who appears before it."). Further, we do not find evidence in the record that suggests the jurors lost their way and returned a verdict against the manifest weight of the evidence. For these reasons, his second assignment of error is overruled.

*Third Assignment of Error*

**{¶23}** In his third assignment of error, McWay alleges he did not receive the effective assistance of counsel that is guaranteed by the Sixth Amendment. In support of this contention, McWay points to (1) the decision of his trial counsel not to request a presentence investigation and (2) the decision not to present mitigating factors at McWay's sentencing hearing.

Legal Standard

**{¶24}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 26, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance

prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If the petitioner cannot prove one of these elements, "it [is] unnecessary for a court to consider the other prong of the test." *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.). The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 61. "Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance." *State v. Pellegrini*, 3d Dist. Allen No. 1-12-30, 2013-Ohio-141, ¶ 40. Appellate courts are to examine the record to determine whether the defendant had a fair proceeding under the circumstances and whether substantial justice was done. *State v. Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304 (1976), paragraph four of the syllabus.

Legal Analysis

{¶25} *Presentence Investigation*: On appeal, McWay argues that his trial counsel's failure to order a new presentence investigation was objectively unreasonable. However, the trial court did have a presentence investigation that was compiled after McWay was found guilty of voluntary manslaughter in 2002. Tr. 543-544, 547. McWay then served a thirteen-year prison sentence for that crime. Tr. 544. After his release, he was charged with another crime and spent the last ten months of 2016 incarcerated while he awaited trial in January of 2017. Tr. 547. He was then acquitted and released on January 13, 2017. Tr. 544. Within thirty-six

hours of McWay's release, Jeffers was murdered. Tr. 544. McWay was then incarcerated again. Tr. 544.

{¶26} Thus, at sentencing, McWay's trial counsel stated:

**Your Honor, I guess first of all I should acknowledge for the record that prior to coming up for sentencing we had discussed briefly that the Court has a prior pre-sentence investigation report from the 2002 case. I believe it was this Court that that case was in front of back in 2002. I was counsel for that case. From that time of conviction until just very recently obviously my client was incarcerated on that charge and then he had at least ten months between—well, ten months of the time that he had been out he was incarcerated on the charge that he was acquitted of in January. I don't believe it's necessary, based upon that, that the Court need to order any sort of other pre-sentence investigation report. The Court has enough of the history, I think, in front of it. I believe also during the course of my client's incarceration for the Voluntary Manslaughter with gun specification I believe that several times on his behalf I filed motions for judicial release, which were not granted, but my understanding is the Court, during those times, has at least a summary of institutional behavior, at least that probably would have been given to the Court sometime. We don't have anything really to add or subtract to those documents. They are what they are. My client's record is my client's record.**

Tr. 548. On appeal, McWay wants us to assume that a presentence investigation would have had a favorable impact on his sentence. However, trial counsel stated that he had represented McWay's multiple times over sixteen years. Tr. 548. At the sentencing hearing, McWay's trial counsel explained the rationale behind his decision not to request a new presentence investigation. For these reasons, we find that, under the facts of this case, the decision not to request a new presentence investigation for this defendant does not amount to a deficient performance. *See*

*State v. Melendez*, 6th Dist. Wood No. WD-07-052, 2008-Ohio-3839, ¶ 15 (holding "that failure to request a presentence investigation report does not constitute ineffective assistance of counsel."); *State v. Palmer*, 7th Dist. Jefferson No. 04-JE-41, 2006-Ohio-749, ¶ 105.

**{¶27}** *Mitigating Information*: "The presentation of mitigating evidence is a matter of trial strategy." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 225. "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). Further, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Hand* at ¶ 225, quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). On appeal, McWay argues that his trial counsel's investigation into potential mitigating factors was inadequate because no mitigation evidence was presented at sentencing. However, the absence of mitigating evidence does not, in itself, establish that trial counsel's investigation was inadequate. McWay expects us to presume that mitigating factors would certainly have been uncovered by an adequate investigation. These arguments are speculative as McWay has not demonstrated, with facts in the record, that mitigating evidence exists or that trial counsel's investigation was inadequate. Further, we do not see any indication in the record that trial counsel failed to investigate mitigating

factors adequately or that trial counsel's performance was deficient in this regard. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244.

{¶28} From the record, we do not see evidence that supports McWay's contention that his trial counsel's performance was deficient. We do, however, see evidence that trial counsel's decisions were matters that fell within the ambit of trial strategy and were arguably reasonable. Thus, McWay has not carried the burden of establishing that he did not receive the effective assistance of counsel at sentencing. For these reasons, appellant's third assignment of error is overruled.

*Conclusion*

{¶29} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**