[Cite as *State v. Huffman*, 2026-Ohio-1618.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY

STATE OF OHIO,                                    CASE NO. 13-25-13

      PLAINTIFF-APPELLEE,

  v.

RHONDA A. HUFFMAN,                         **OPINION AND**
                                     **JUDGMENT ENTRY**
      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 24 CR 0156

**Judgment Affirmed**

**Date of Decision:  May 4, 2026**

APPEARANCES:

    *Joseph C. Patituce* **for Appellant**

    *Angela M. Boes* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Rhonda A. Huffman ("Huffman") appeals the judgment of the Seneca County Court of Common Pleas, arguing that her conviction is not supported by sufficient evidence; that she was denied her right to the effective assistance of counsel; and that the trial court erred in permitting a witness to offer an opinion as to her credibility or guilt. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Calvert Catholic School ("Calvert") is located in Seneca County, Ohio. The school building has a basement level with a long corridor that provides access to several classrooms. Running perpendicular to this long corridor is a short hallway that leads to a staircase. Huffman was employed as a teacher at Calvert and had a classroom around the corner from the short hallway in the basement.

{¶3} On April 24, 2024, a sixth-grade student, A.O., was walking down the short hallway in the basement when she saw a folded piece of paper on the ground. A.O. picked up this paper and walked over to a trash can that was located in the long corridor and next to the short hallway. A.O. later testified that she did not read or "really pay much attention" to this paper before she threw it into the trash can and went to her next class. (Tr. 196).

{¶4} At trial, the State introduced recordings from a security camera positioned in the long corridor. In this footage, Huffman can be seen a short distance away from where A.O. was standing at the time she threw the paper into the trash can. Huffman then put a stack of papers into a nearby recycling bin before glancing into the trash can and walking down the hallway after A.O.

{¶5} A.O. testified that she was sitting in a classroom when Huffman approached her and asked to speak with her in the hallway. Huffman then asked where A.O. had found the "note." (Tr. 202). A.O. walked with Huffman to the short hallway and pointed to where she had found the piece of paper. In the security camera footage, Huffman can then be seen walking towards the trash can; bending over to reach into it; and pulling out the paper. A.O. then returned to her class.

{¶6} Huffman then took this paper to the school administration. She indicated that "a student had brought it [the note] to her attention" with concerns for the safety of the school. (Tr. 241). This paper contained the following message:

> 4-24
> Calvert is a bad
> Place And the people
> in the school should
> die! I live in
> a daily hell +
> now you will to.
> Today it happens.
> Only # know when
>                 +
> what floor.
>
> Sory!

(Ex. 24). In response, the principal, Dr. Megan Schultz ("Dr. Schultz"), ordered the school into a soft lockdown. This process involved keeping the classroom doors closed and stationing administrators in the hallways. But aside from these measures, the students maintained "their traditional routine. . . ." (Tr. 240).

{¶7} Dr. Schultz talked to A.O. after speaking with Huffman. Dr. Schultz testified that A.O. "did not know at that time [the] contents of the note or that it was concerning." (Tr. 244). She also stated that A.O. did not seem "frazzled" and calmly explained how she had thrown away the paper. (Tr. 244). At roughly 4:18 P.M., Dr. Schultz called the police to make a report. Two officers came to the school and collected the note. As a precaution, one of the officers arranged for a police cruiser to be at the school the next day.

{¶8} On the morning of May 7, 2024, two teenage students, L.R. and E.R., walked down the long corridor and turned into the short hallway in the basement. They then went up the staircase on their way to the bathrooms on the first floor. A few minutes later, they came back down the staircase and observed a paper lying on the ground. Neither L.R. nor E.R. remembered seeing this paper on the floor when they went up the staircase a few minutes earlier. L.R. picked up the paper, but before he read what had been written on it, E.R. told him that they had to get back to class. L.R. then tossed the paper back onto the ground in the short hallway and followed E.R. to their classroom.

{¶9} Shortly thereafter, two other teenage students, E.S. and L.S., walked down the long corridor and turned into the short hallway. After seeing the paper on the ground, L.S. picked it up and read the following message:

> take my advice + leave now!
> My gun is ready + it will get
> ugLy. find the LisT + the
> names. Be ready to call
> 911 + god. Eat lead.

(Ex. 25). L.S. decided to bring this note to the administration and crumpled it up so that no one could see the message as he walked to the front office. L.S. and E.S. then walked down the long corridor and presented the note to the administrative staff.

{¶10} After the note was brought to her attention, Dr. Schultz ordered a hard lockdown of the building and then called law enforcement. When the police arrived, they facilitated an evacuation of the student body. In this timeframe, Lieutenant Mark E. Marquis ("Lt. Marquis") of the Tiffin Police Department began investigating this incident. He conducted interviews with L.R., E.R., L.S. and E.S. that afternoon.

{¶11} As part of this process, the school administration gave Lt. Marquis access to the footage from the security camera system in the building. No security camera was positioned to capture what occurred in the short hallway where the notes had been found. However, security cameras were positioned to capture what

transpired in the long corridor in the basement and at the top of the staircase on the first floor.

{¶12} The footage shows that L.R. and E.R. walked down the long corridor; turned into the short hallway; and emerged from the staircase on the first floor at roughly 9:40 A.M. L.R. and E.R. remained on the first floor for around two minutes. In this timeframe, seven students can be seen walking down the long corridor; turning into the short hallway; and emerging at the top of the staircase on the first floor.[1] Detective Marquis observed that no papers were visible in the hands of these students as they were walking in this area.

{¶13} The footage then shows Huffman walking down the long corridor with a stack of papers in her hands and turning into the short hallway. She remained outside of the view of the security cameras for eight seconds before she reemerged in the long corridor. But unlike the other seven students who walked into the short hallway in this timeframe, Huffman did not emerge on the first floor at the top of the staircase in the camera footage. Instead, Huffman returned into the long corridor after spending only a few seconds in the short hallway.

{¶14} At roughly 9:42 A.M., L.R. and E.R. can be seen walking from the bathrooms and towards the top of the staircase on the first floor. These two students can been seen emerging from the short hallway seconds after Huffman had walked

---

[1] Five of these students were walking through the school together as a group while the other two students walked through this area alone.

back into the long corridor. L.R. and E.R. then walked down the long corridor. Less than one minute later, L.S. and E.S. can be seen walking from the long corridor and into the short hallway. L.S. then came out of the short hallway with a crumpled piece of paper in his hands as he walked towards the school office.

{¶15} After reviewing these security camera recordings, Lt. Marquis went to the school and had a brief interview with Huffman on May 8, 2024. He presented her with a series of images from the security camera footage and asked why she walked into the short hallway but did not go up the stairs. Huffman told him that she walked into the short hallway because she had intended to go upstairs to shred some documents on the first floor.

{¶16} However, Huffman stated that she changed her mind once she entered the short hallway because she remembered the administration had recently instructed teachers not to leave students in their classrooms unattended. For this reason, she decided to turn around and returned to her classroom. After hearing these comments, Lt. Marquis told Huffman that he believed she had put the note in the short hallway. Lt. Marquis later testified that, in response, Huffman denied any involvement with placing the notes in the short hallway.

{¶17} On June 6, 2024, Huffman was indicted on two counts of inducing panic in violation of R.C. 2917.31(A)(1) as second-degree felonies pursuant to R.C. 2917.31(C)(5). On April 14, 2025, the jury trial on these charges began. On April 17, 2025, the jury acquitted Huffman on the first count in the indictment but returned

a verdict of guilty on the second count of inducing panic in violation of R.C. 2917.31(A)(1) as a second-degree felony. On May 13, 2025, the trial court issued its judgment entry of sentencing.

{¶18} Huffman filed her notice of appeal on May 16, 2025. On appeal, she raises the following three assignments of error:

### First Assignment of Error

**Appellant's conviction was not based on sufficient evidence as required by the United States and Ohio Constitutions.**

### Second Assignment of Error

**Appellant was deprived of the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

### Third Assignment of Error

**The trial court erred by permitting the detective to testify over objection as to his belief that appellant was guilty, or in the alternative that appellant's denial of guilt was not credible.**

We will consider the first and third assignments of error before the second assignment of error.

*First Assignment of Error*

{¶19} Huffman argues that her conviction for inducing panic is not supported by sufficient evidence.

Legal Standard

**{¶20}** "A sufficiency-of-the-evidence analysis examines whether the State has carried its burden of production at trial." *State v. Whitt*, 2025-Ohio-424, ¶ 16 (3d Dist.). "On review, an appellate court is not to consider whether the evidence at trial should be believed but whether the evidence, if believed, could provide a legal basis for the finder of fact to conclude that the defendant is guilty of the crime charged." *State v. Daniels*, 2024-Ohio-1536, ¶ 13 (3d Dist.).

> Accordingly, the applicable standard 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.'

*State v. Reed*, 2024-Ohio-4838, ¶ 30 (3d Dist.), quoting *State v. Plott*, 2017-Ohio-38, ¶ 62 (3d Dist.).

**{¶21}** A conviction for inducing panic in violation of R.C. 2917.31(A)(1) requires the State to prove that the defendant "cause[d] the evacuation of any public place, or otherwise cause[d] serious public inconvenience or alarm, by . . . [i]nitiating or circulating a report or warning of an alleged or impending fire, explosion, crime, or other catastrophe, knowing that such report or warning is false[.]" Further, this offense is a second-degree felony "[i]f the public place . . . [was] a school or an institution of higher education . . . ." R.C. 2917.31(C)(5).

Legal Analysis

**{¶22}** Huffman argues that the State did not establish that she was the person who placed the note in the hallway on May 7.  At trial, L.R. and E.R. testified that they did not see the note on the floor when they went up the stairs to go to the restroom on the first floor of the school building.  But on their return, they saw the note in front of the staircase in the short hallway.

**{¶23}** Based on this information, Lt. Marquis examined the security camera footage to see who entered the short hallway while L.R. and E.R. were on the first floor.  He testified that all four boys—L.R., E.R., L.S., and E.S.—described the paper as being flat on the floor when they saw it in the short hallway.  Given this description, Lt. Marquis thought the paper was not likely taken into the short hallway in someone's pocket as this would have crumpled the paper.  For this reason, he examined the security camera footage to see if anyone was carrying a paper as they went into the short hallway.

**{¶24}** In the period of roughly two minutes in which L.R. and E.R. were on the first floor, seven students can be seen walking through the short hallway.  None of these students had any papers in their hands as they walked into the short hallway.  However, Huffman can be seen carrying a stack of papers as she entered the short hallway.  In this timeframe, she was the only person who entered the short hallway while carrying any papers.

{¶25} Further, the other students who entered the short hallway in this time period can be seen emerging on the first floor in the footage from the security camera at the top of the staircase. Huffman walked down the long corridor and turned into the short hallway. She was out of the view of the security cameras for roughly eight seconds before she left the short hallway and reentered the long corridor. Thus, in the relevant timeframe, she was the only person who entered the short hallway and did not go up the staircase to the first floor.

{¶26} Huffman was also the last person to enter the short hallway before L.R. and E.R. went down the staircase; saw the paper on the floor in the short hallway; and emerged into the long corridor. After reviewing this security camera footage, Lt. Marquis presented these clips to the school administration. Once she had seen Huffman in this recording, Dr. Schultz informed Lt. Marquis that, roughly two weeks before the May 7 incident, Huffman had brought the administration a similar note that was discovered in the exact same hallway.

{¶27} Dr. Schultz indicated that, on April 24, Huffman informed the administration that a student, A.O., had brought the note to her. However, A.O. told the administration that she was not aware of what the note said or that its contents were "concerning." (Tr. 244). In the footage reviewed by Lt. Marquis, Huffman can be seen walking by A.O as she (A.O.) threw the note into the trash can. Huffman then moved over to the trash can and briefly glanced into it before she followed A.O. down the corridor.

{¶28} Shortly thereafter, A.O. and Huffman can be seen walking to the short hallway. After A.O. pointed out where she discovered the note, they walked to the trash can in the long corridor. Huffman then reached down into the trash can and pulled out the note. After reviewing the security camera footage, Lt. Marquis approached Huffman to discuss what transpired in these recordings.

{¶29} Huffman indicated that she was going upstairs to shred some documents but remembered that the administration had directed the teachers to remain in their classrooms with the students. She stated that she turned around in the short hallway and went back to her classroom.

{¶30} In response to this evidence, Huffman argues that the State did not introduce any eyewitness testimony that establishes that she put the note on the floor in the hallway. However, "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991). Thus, the absence of direct evidence at trial does not mean that Huffman's conviction was not supported by sufficient evidence.

{¶31} Huffman also argues that the students' who were called as witnesses at trial gave inconsistent testimony. The existence of inconsistencies between witness's accounts generally goes to the weight that should be ascribed to the testimony rather than to the sufficiency of the evidence. *In re C.S.*, 2024-Ohio-1063, ¶ 14 (8th Dist.) (Arguments addressing "inconsistencies in a witness's testimony relate[] to the witness's credibility and the weight to be given that

evidence."). While not set forth as a separate assignment of error, we will address Huffman's manifest-weight argument.

**{¶32}** "A manifest-weight analysis examines whether the State has carried its burden of persuasion at trial." *State v. Carroll*, 2024-Ohio-1626, ¶ 58 (3d Dist.). On review, "an appellate court's function . . . is to determine whether the greater amount of credible evidence supports the verdict." *State v. Harvey*, 2020-Ohio-329, ¶ 12 (3d Dist.), quoting *Plott*, 2017-Ohio-38, ¶ 73 (3d Dist.).

> Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶33}** In this case, L.R., E.R., L.S., and E.S. each provided testimony at trial and were cross-examined by defense counsel.[2] The jury was able to compare these accounts with each other and with the portions of their accounts that were captured in the security camera footage. As the finder of fact, the jury "may take note of any

---

[2] Huffman only alleges one discrepancy in her brief. She points out that E.R. and L.S. identified different locations in the short hallway when Lt. Marquis asked each of them to place a piece of paper in the area where they first saw the note. However, E.R. and L.S. did not go into the short hallway at the same time. The trial testimony indicates that L.R. picked up the note but "threw it back down" on the ground when E.R. reminded him that they needed to hurry to class. (Tr. 322). The record contains no indication that, when L.R. "threw" the note, he returned it to the exact location where he and E.R. had first seen it. (Tr. 322). Thus, when L.S. entered the short hallway a few seconds later, the note was not necessarily in the same location where E.R. had first seen the note.

inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.'" *State v. Carter*, 2022-Ohio-1444, ¶ 97 (3d Dist.), quoting *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). Having examined the record, we conclude that this argument does not establish that Huffman's conviction was not supported by sufficient evidence or against the manifest weight of the evidence. *See State v. Stewart*, 2011-Ohio-466, ¶ 20 (10th Dist.).

**{¶34}** Finally, Huffman argues that her conviction should be reversed because Lt. Marquis's investigation was too brief. Again, this evidence goes more to the weight of the evidence than its sufficiency. In this argument, Huffman asserts that the investigation only lasted one day because the incident occurred on May 7, 2024 and Lt. Marquis had identified her as the key suspect on May 8, 2024. As an initial matter, we note that the investigation continued for longer than one day as the police sent materials to the Ohio Bureau of Criminal Investigation ("BCI") for forensic examination.

**{¶35}** Further, defense counsel questioned Lt. Marquis about the length and breadth of the police investigation into this incident. The jury could consider this information in evaluating the weight and credibility of the evidence against Huffman. Having examined the evidence in the record, we conclude that this argument does not establish that the jury lost its way and returned a verdict that was against the manifest weight of the evidence. Accordingly, the first assignment of error is overruled.

{¶36} For ease of analysis, we elect next to address the third assignment of error out of order.

*Third Assignment of Error*

{¶37} Huffman asserts that Lt. Marquis gave improper opinion testimony that addressed her guilt or credibility.

Legal Standard

{¶38} Evid.R. 701 governs the admissibility of opinion testimony from lay witnesses and reads as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

"The distinction between lay and expert witness opinion testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *State v. McKee*, 2001-Ohio-41, fn. 2 (2001), quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992).

{¶39} "Testimony in the form of an opinion 'is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact.'" *State v. Shepherd*, 2020-Ohio-3915, ¶ 46 (3d Dist.), quoting Evid.R. 704. However, "seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness'

and the witness turns into little more than an 'oath helper.'" *State v. Johnson*, 2002-Ohio-6957, ¶ 36 (10th Dist.), quoting *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986).

{¶40} Further, "[i]n our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988). Thus, a witness "infringe[s] upon the role of the finder of fact" by providing an opinion as to the credibility or veracity of another witness. *State v. Bruce*, 2023-Ohio-3298, ¶ 60 (3d Dist.), quoting *State v. Smith*, 2017-Ohio-9283, ¶ 46 (10th Dist.).

{¶41} "No improper vouching occurs so long as the prosecutor or the witness does not express any personal belief about another witness' credibility." *State v. Scott*, 2025-Ohio-419, ¶ 20 (3d Dist.), quoting *State v. Paige*, 2019-Ohio-1088, ¶ 45 (7th Dist.). Further, "[a]n officer is not vouching for witness credibility, however, by explaining the investigative procedure he followed." *State v. Sutton*, 2014-Ohio-1074, ¶ 49 (8th Dist.).

Standard of Review

{¶42} An appellate court usually reviews the decisions of the trial court regarding the admission of opinion testimony from expert or lay witnesses under an abuse-of-discretion standard. *State v. Smith*, 2022-Ohio-4687, ¶ 38 (3d Dist.); *State v. Burkard*, 2025-Ohio-5787, ¶ 52 (3d Dist.). An abuse of discretion is more than

an error of judgment but is present where a decision is arbitrary, unreasonable, or unconscionable. *Bruce*, 2023-Ohio-3298, at ¶ 22 (3d Dist.).

Legal Analysis

**{¶43}** Huffman asserts that Lt. Marquis gave improper opinion testimony in response to a line of questioning that discussed an interview that he had conducted with her. She identifies the following statements in her brief:

> I proceeded to ask her about her knowledge of this case. She . . . explained what she knew . . . . [S]he had been cleaning out files. . . . So she left the classroom and she was going to shred these documents because they were IEPs and the school did not want them to be just thrown into a recycling bin. So she entered into that short hallway to head up the stairs. And she recalled at that point that the school had just reminded them the day prior that they were not supposed to leave their rooms when they have students there, and so she turned back to go back to her classroom . . . .
>
> . . .
>
> I believe I confirmed with her that she had students in her room . . . because . . . just the day before she had been reminded that she's not to leave the classroom when there's students in there . . . . *And then at that point I . . . had the belief . . . that Ms. Huffman was the person responsible for having placed the note in the short hallway.* And so I turned my attention to showing her still photos . . . from the surveillance video . . . including herself going into the hallway and coming out. *And then explained to her based on what I saw that it was my belief that she had placed that note in the hallway.* And I gave her the opportunity to explain herself. She denied that she had any involvement. . . .

(Emphasis added.) (Tr. 529, 530-531). However, defense counsel did not raise a contemporaneous objection in response to this testimony or any objection related to this matter before the trial court adjourned this proceeding for the evening.

-17-

**{¶44}** As a general matter, a party must raise a contemporaneous objection to preserve an alleged error at trial for appellate review. *State v. Singleton*, 2019-Ohio-1477, ¶ 16 (2d Dist.). "[T]he requirement of a contemporaneous objection is rooted in the principle that judicial economy is best served by first giving the trial court an opportunity to correct its own error, before pursuing appellate remedies." *State v. Brown*, 2013-Ohio-1579, ¶ 32 (2d Dist.). The failure to raise a proper objection at trial waives all but plain error on appeal. *State v. Wilks*, 2018-Ohio-1562, ¶ 84-85 (applying plain error on appeal where defense counsel waited until the end of a witness's testimony to object to earlier comments).

> For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. . . . Under the plain error standard, the appellant must demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise.

*State v. Dixon*, 2025-Ohio-326, ¶ 33 (3d Dist.), quoting *State v. Bradshaw*, 2023-Ohio-1244, ¶ 67 (3d Dist.). Plain error is recognized "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶45}** On appeal, Huffman asserts that the identified portion of Lt. Marquis's testimony contained impermissible opinions as to her credibility and her guilt or innocence. Since no contemporaneous objection was raised to the identified portion of Lt. Marquis's testimony, we review these arguments for plain error only. *Wilks*

-18-

at ¶ 84-85.  As an initial matter, we note that Huffman has identified one answer that was given in the midst of a three-day long trial.

**{¶46}** Further, Lt. Marquis's testimony occurred on two different days with these comments coming as he discussed the course of his investigative process.  We also note that, in a portion of Lt. Marquis's challenged remarks, he was using an interview technique that was designed to prompt a response from Huffman.  He then testified that, in answering him, Huffman denied any involvement in placing the notes in the short hallway.  This context mitigates the potential for prejudice from this portion of his challenged remarks.  *See State v. Bump*, 2013-Ohio-1006, ¶ 84 (3d Dist.) (finding no plain error where a recorded police interview contained statements in which the police used this technique in questioning).

**{¶47}** Most importantly, the jurors were also presented with security camera footage of Huffman entering the short hallway with a stack of papers and leaving the short hallway moments before the note was discovered on the floor.  Given the larger context of this proceeding and the evidence that was presented by the prosecution, we do not conclude that there is a reasonable probability that the outcome of the proceeding would have been otherwise in the absence of these statements.  Even assuming that this portion of Lt. Marquis's testimony contained improper opinion testimony, the admission of this answer does not rise to the level of plain error.  Thus, we find that this initial argument is without merit.

{¶48} However, this conclusion does not end our analysis because Huffman also raises arguments that are based upon an objection that defense counsel made later during Lt. Marquis's testimony. As noted previously, this proceeding adjourned just after Lt. Marquis gave the answer that we examined in the first part of this analysis. When this proceeding reconvened the following morning, Lt. Marquis continued his testimony and discussed the security camera footage from the school. After a "mid-morning break," defense counsel raised an objection based upon "structural error" and the "cumulative nature" of Lt. Marquis's testimony. (Tr. 571).

{¶49} Relying on this objection, Huffman points to six instances in which Lt. Marquis was asked to discuss the "significance" of different portions of the security camera footage.[3] (Tr. 557). In response to these questions, Lt. Marquis described his impressions of what was transpiring in the footage and what these observations meant for his investigation into the incidents in this case. As a general matter, police officers are permitted to interpret events—including those captured in video recordings—based upon their training and experience. *State v. Moss*, 2020-Ohio-2862, ¶ 37-38 (6th Dist.).

{¶50} Further, the security camera footage was played for the jurors at trial. In the six exchanges identified by Huffman on appeal, much of Lt. Marquis's

---

[3] On appeal, Huffman does not frame any arguments on the basis of "structural error." (Tr. 571). Rather, her argument seems to be based more upon the "cumulative nature" portion of defense counsel's objection. *Id*. For this reason, we do not examine Lt. Marquis's testimony for structural error.

testimony was describing what the jurors could see for themselves in the video recordings. *State v. Scott*, 2018-Ohio-198, ¶ 59 (2d Dist.). Thus, "the jury was free to agree or disagree with . . . [Detective Marquis's] description based on their own observation of the video evidence." *State v. McInnes*, 2026-Ohio-734, ¶ 55 (8th Dist.).

**{¶51}** Since Huffman's argument fails to establish that Lt. Marquis's testimony in these six instances constituted error, we conclude that the trial court did not err in overruling defense counsel's objection that challenged the "cumulative nature" of his testimony. (Tr. 571). Additionally, the jurors were able to review the security camera footage independently and could evaluate any statements that Lt. Marquis made against what they could see on the video recordings. *See State v. Scott*, 2025-Ohio-419, ¶ 36 (3d Dist.). Accordingly, the third assignment of error is overruled.

### Second Assignment of Error

**{¶52}** Huffman argues that she was denied her right to the effective assistance of counsel because her attorney's failed to object at several points during the trial.

### Legal Standard

**{¶53}** "Ohio law presumes that a licensed attorney's representation was competent." *State v. Morgan*, 2024-Ohio-625, ¶ 13 (3d Dist.). "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of

establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 2018-Ohio-3618, ¶ 24 (3d Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**{¶54}** To establish deficient performance, the appellant must demonstrate that defense "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 2017-Ohio-4349, ¶ 35 (3d Dist.), quoting *Strickland* at 687. In general, matters that fall within the ambit of trial strategy or debatable tactics do not constitute ineffective assistance of counsel. *State v. Wears*, 2023-Ohio-4363, ¶ 32 (3d Dist.). Further, defense counsel is not required to "raise meritless issues or even all arguably meritorious issues." *State v. Mayse*, 2017-Ohio-1483, ¶ 24 (3d Dist.).

**{¶55}** To establish prejudice, "the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Bibbs*, 2016-Ohio-8396, ¶ 13 (3d Dist.). "If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test." *State v. Gear*, 2023-Ohio-1246, ¶ 50 (3d Dist.).

Legal Analysis

**{¶56}** On appeal, Huffman identifies three main instances in which she believes defense counsel should have objected. In considering these arguments, we

remain mindful that defense counsel's failure to object is generally considered a matter of trial strategy. *State v. Grant*, 2023-Ohio-2720, ¶ 55 (3d Dist.).

{¶57} First, Huffman asserts that defense counsel should have objected after Lt. Marquis testified about several observations that he made while examining the two notes that were found in the short hallway. At trial, Lt. Marquis stated that the notes contained messy handwriting and misspellings of basic words. He pointed out that the word "sorry" was spelled "sory" and that the note was found "in a school building full of 6th to 12th graders, who should at that point very easily be able to spell the word 'sorry' . . . ." (Tr. 581).

{¶58} Lt. Marquis also mentioned that the handwriting in the first part of the April 24 note appeared to be different from that used in the second part of the note. Based on these observations, he conducted his investigation on the assumption that the writer may have been "disguis[ing]" his or her "actual penmanship" in an "effort to hide their identity" by posing as an "unintelligent student" or "a person who . . . has poor penmanship and grammar." (Tr. 580, 581).

{¶59} On appeal, Huffman asserts that these statements constituted improper opinions because Lt. Marquis, as a lay witness was not qualified as a handwriting expert. However, the cases that Huffman cites in support of her argument address situations in which a witness linked the handwriting in a document to a specific person. *State v. Brennan*, 2002-Ohio-5952, ¶ 5-7 (5th Dist.); *State v. Silverman*, 2006-Ohio-3826, ¶ 44, 61 (10th Dist.).

{¶60} In contrast, Lt. Marquis did not, in this testimony, state that the handwriting in the notes belonged to Huffman or matched a writing exemplar from Huffman. *State v. Cooper*, 2006-Ohio-817, ¶ 12 (8th Dist.). While he mentioned that the handwriting in the two notes contained some resemblances, he also declined to state definitively whether the same person wrote both notes because he was "not an expert" on handwriting analysis. (Tr. 580). *Cooper* at ¶ 23. These basic observations stand in contrast to opinions that require expertise to identify a specific person as the author of a message based on handwriting comparisons.

{¶61} This testimony merely explained why his investigation did not eliminate adults as potential suspects. Further, since both of these notes were admitted into evidence, the jury would have been able to evaluate Lt. Marquis's basic observations against these exhibits. Given this context, we conclude that Huffman's arguments fail to establish that there is a reasonable probability that the outcome of this proceeding would have been different in the absence of this statement. Thus, the first argument is without merit.

{¶62} Second, Huffman argues that defense counsel should have objected when the prosecution asked Lt. Marquis questions about the results of DNA tests, fingerprint analyses, and handwriting comparisons that were conducted by BCI on the two notes found in the short hallway. She argues that this testimony violated the Confrontation Clause because the experts who conducted these analyses and authored the resulting reports did not testify at trial.

{¶63} If a defendant demonstrates that his or her rights under the Confrontation Clause were violated at trial, "the Supreme Court of Ohio has consistently applied a harmless-error analysis to determine whether the issue prejudiced the defendant." *State v. Scott*, 2025-Ohio-419, ¶ 11 (3d Dist.), citing *State v. McKelton*, 2016-Ohio-5735, ¶ 192. In this analysis, "the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Bush*, 2023-Ohio-4473, ¶ 98 (3d Dist.).

{¶64} At trial, the State asked Lt. Marquis about whether the forensic analyses of the two notes "provide[d] anything of significance in . . . [the] investigation[.]" (Tr. 583). He reported that the fingerprint analyses and DNA tests did not link Huffman to the two notes. He also stated he obtained a writing sample from Huffman for comparison with the two notes. However, Lt. Marquis testified that the comparisons were "inconclusive" and that "they could not determine whether or not it [the handwriting sample] was a match" for the notes. (Tr. 583).

{¶65} On cross-examination, Lt. Marquis affirmed that BCI concluded "there was no evidence that Ms. Huffman wrote those two notes." (Tr. 601). In response to questions on redirect examination, he affirmed that "inconclusive" meant "that no conclusion could be offered regarding the . . . writing" because the note appeared to "contain unnatural or disguised handwriting." (Tr. 661, 662-663). As an initial matter, we note that this challenged testimony emphasized and

reemphasized the fact that the forensic analyses conducted in this case could *not* connect Huffman to the two notes that were found in the short hallway.

**{¶66}** Even if this testimony was not consistent with the demands of the Confrontation Clause, we conclude that any error was harmless beyond a reasonable doubt because this evidence did *not* link Huffman to the notes and did not, therefore, contribute to her conviction. Since this line of inquiry ultimately established that the State was unable to connect Huffman to the two notes with any forensic evidence from BCI, she cannot demonstrate that defense counsel's failure to object was not a matter of trial strategy or was prejudicial in this case. Thus, the second argument is without merit.

**{¶67}** Third, Huffman asserts that Lt. Marquis made comments that vouched for other witnesses and that her defense counsel was ineffective for failing to raise an objection to these statements. We reincorporate the legal standard for improper vouching that was set forth under the third assignment of error.

**{¶68}** Huffman identifies a portion of testimony in which the State asked Lt. Marquis how L.S. and E.S. responded to questions in his interviews with them. He responded, "Open, forthcoming. They didn't really even seem to be affected by speaking with law enforcement at that time." (Tr. 502). In this line of questioning, Lt. Marquis indicated that these students were not evasive but willingly volunteered answers. *See State v. Madaris*, 2008-Ohio-4669, ¶ 18, 22-23 (8th Dist.) In this context, he was not ultimately commenting on the truthfulness or veracity of their

statements but describing their behavior. *See State v. Myers*, 2018-Ohio-1903, ¶ 146-147; *State v. Carpenter*, 2013-Ohio-1385, ¶ 37 (12th Dist.).

{¶69} As a part of her third argument herein, Huffman also asserts that defense counsel should have objected when the State asked Lt. Marquis to address an inconsistency between the accounts of the students who saw the note on the floor on May 7, 2024. While being cross-examined by defense counsel, Lt. Marquis acknowledged that the students who testified at trial gave different descriptions of where the note was located in the short hallway at the time of its discovery. On redirect examination, the State addressed this earlier line of questioning. In response, Lt. Marquis indicated that inconsistencies between multiple or young witnesses was not necessarily uncommon in his experience.

{¶70} We note that the precise location of the note on the floor in the short hallway was not integral to prosecuting the crime of inducing panic in this case. Further, because these students did not see who put the note in the short hallway, their testimony only described their discovery of this note. Their testimony did not connect Huffman to the note in the hallway. The State relied on the security camera footage to connect Huffman to the May 7 note, not eyewitness testimony.

{¶71} In light of this context, Huffman has not demonstrated how the result of this proceeding could have been different if defense counsel had objected to a statement that addressed a minor inconsistency in this case. Thus, even if this testimony was improper, Huffman has not demonstrated prejudice. We conclude

the third argument is without merit. In conclusion, these three arguments fail to establish that Huffman was deprived of her right to the effective assistance of counsel. Accordingly, her second assignment of error is overruled.

*Conclusion*

{¶72} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Seneca County Court of Common Pleas is affirmed.

**_Judgment Affirmed_**

**MILLER and WALDICK, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. *See* App.R. 30.

_____
John R. Willamowski, Judge


_____
Mark C. Miller, Judge


_____
Juergen A. Waldick, Judge

DATED:
/hls